# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-4021

_____

| | | |
|---|---|---|
| Republican Party of Minnesota, an association; Indian Asian American Republicans of Minnesota, an association; Republican Seniors, an association; Young Republican League of Minnesota, a Minnesota nonprofit corporation; Minnesota College Republicans, an association, | * * * * * * * * * | |
| Plaintiffs - Appellants, | * * * | |
| | * * * * | Appeals from the United States District Court for the District of Minnesota. |
| Gregory F. Wersal, individually, | | |
| Plaintiff, | * * | |
| Cheryl L. Wersal, individually; Mark E. Wersal, individually; Corwin C. Hulbert, individually, | * * * * | |
| Plaintiffs - Appellants, | * * | |
| Campaign for Justice, an association, | * * | |
| Plaintiff, | * * | |
| Minnesota African American Republic Council, an association, | * * * | |
| Plaintiff - Appellant, | * | |

|                                                              |   |
|--------------------------------------------------------------|---|
|                                                              | * |
| Muslim Republicans, an association;                          | * |
| Michael Maxim, individually; Kevin J.                        | * |
| Kolosky, individually,                                       | * |
|                                                              | * |
|      Plaintiffs,                    | * |
|                                                              | * |
|      v.                             | * |
|                                                              | * |
| Verna Kelly, in her capacity as                              | * |
| Chairperson of the Minnesota Board of                        | * |
| Judicial Standards, or her successor,                        | * |
|                                                              | * |
|      Defendant,                     | * |
|                                                              | * |
| Barry M. Lazarus, in his capacity as                         | * |
| Chairperson of the Minnesota Board of                        | * |
| Judicial Standards, or his successor;                        | * |
| Edward J. Cleary, in his capacity as                         | * |
| director of the Minnesota Office of                          | * |
| Lawyers Professional Responsibility, or                      | * |
| his successor; Charles E. Lundberg,                          | * |
| in his capacity as Chair of the                              | * |
| Minnesota Lawyers Professional                               | * |
| Responsibility Board, or his                                 | * |
| successor,                                                   | * |
|                                                              | * |
|      Defendants - Appellees,        | * |
|                                                              | * |
| Minnesota Civil Liberties Union,                             | * |
|                                                              | * |
|      Amicus on Behalf of Appellants,| * |
|                                                              | * |
| The Minnesota State Bar Association,                         | * |
|                                                              | * |
|      Amicus on Behalf of Appellee.  | * |
|                                                              | * |

| | |
|---|---|
| Republican Party of Minnesota, an | * |
| association; Indian Asian American | * |
| Republicans of Minnesota, as | * |
| association; Republican Seniors, an | * |
| association; Young Republican League | * |
| of Minnesota, a Minnesota nonprofit | * |
| corporation; Minnesota College | * |
| Republicans, an association; Minnesota | * |
| African American Republic Council, an | * |
| association; Cheryl L. Wersal, | * |
| individually; Mark E. Wersal, | * |
| individually; Corwin C. Hulbert, | * |
| individually; Gregory F. Wersal, | * |
| individually; Campaign for Justice, an | * |
| association; Muslim Republicans, an | * |
| association, | * |
| | * |
|    Plaintiffs, | * |
| | * |
| Michael Maxim, individually, | * |
| | * |
|    Plaintiff - Appellant, | * |
| | * |
| Kevin J. Kolosky, individually, | * |
| | * |
|    Plaintiff, | * |
| | * |
|    v. | * |
| | * |
| Verna Kelly, in her capacity as | * |
| Chairperson of the Minnesota Board of | * |
| Judicial Standards, or her successor, | * |

|  | * |
|---|---|
| Defendant, | * |
|  | * |
| Barry M. Lazarus, in his capacity as | * |
| Chairperson of the Minnesota Board of | * |
| Judicial Standards, or his successor; | * |
| Edward J. Cleary, in his capacity as | * |
| director of the Minnesota Office of | * |
| Lawyers Professional Responsibility, or | * |
| his successor; Edward J. Cleary, in his | * |
| capacity as Director of the Minnesota | * |
| Office of Lawyers Professional | * |
| Responsibility, or his successor; | * |
| Charles E. Lundberg, in his capacity as | * |
| Chair of the Minnesota Lawyers | * |
| Professional Responsibility Board, or his | * |
| successor, | * |
|  | * |
| Defendants - Appellees, | * |
|  | * |
| The Minnesota State Bar Association, | * |
|  | * |
| Amicus on Behalf of Appellee. | * |

_____

No. 99-4029

_____

| Republican Party of Minnesota, an | * |
|---|---|
| association; Indian Asian American | * |
| Republicans of Minnesota, an | * |
| association; Republican Seniors, an | * |
| association; Young Republican League | * |
| of Minnesota, a Minnesota nonprofit | * |
| corporation; Minnesota College | * |
| Republicans, an association, | * |

|  | * |
| Plaintiffs, | * |
|  | * |
| Gregory F. Wersal, individually, | * |
|  | * |
| Plaintiff - Appellant, | * |
|  | * |
| Cheryl L. Wersal, individually; Mark E. | * |
| Wersal, individually; Corwin C. Hulbert, | * |
| individually; | * |
|  | * |
| Plaintiffs, | * |
|  | * |
| Campaign for Justice, an association; | * |
|  | * |
| Plaintiff - Appellant, | * |
|  | * |
| Minnesota African American Republic | * |
| Council, an association; Muslim | * |
| Republicans, an association; Michael | * |
| Maxim, individually; | * |
|  | * |
| Plaintiffs, | * |
|  | * |
| Kevin J. Kolosky, individually, | * |
|  | * |
| Plaintiff - Appellant, | * |
|  | * |
| v. | * |
|  | * |
| Verna Kelly, in her capacity as | * |
| Chairperson of the Minnesota Board of | * |
| Judicial Standards, or her successor; | * |
|  | * |
| Defendant, | * |
|  | * |
| Barry M. Lazarus, in his capacity as | * |

Chairperson of the Minnesota Board of    *
Judicial Standards, or his successor;    *
Edward J. Cleary, in his capacity as    *
director of the Minnesota Office of    *
Lawyers Professional Responsibility, or  *
his successor; Charles E. Lundberg, in   *
his capacity as Chair of the Minnesota   *
Lawyers Professional Responsibility    *
Board, or his successor,    *
   *
     Defendants - Appellees,    *
   *
The Minnesota State Bar Association,   *
   *
     Amicus on Behalf of Appellants.   *

_____

Submitted: May 10, 2000

Filed: April 30, 2001
_____

Before McMILLIAN, JOHN R. GIBSON, and BEAM, Circuit Judges.
_____

JOHN R. GIBSON, Circuit Judge.

The issue before us in this appeal is whether Canon 5 of the Minnesota Code of Judicial Conduct, a rule promulgated by the Supreme Court of Minnesota to deal with political activity deemed inappropriate to judicial office, violates the First and Fourteenth Amendments of the United States Constitution. Canon 5 restricts candidates for judicial office from attending and speaking at partisan political gatherings; identifying their membership in a political party; seeking, accepting, or using a political party endorsement; announcing their views on disputed legal and

-6-

political issues; personally soliciting campaign contributions; or authorizing or knowingly permitting others to do these things on the candidates' behalf. The district court[1] held that Canon 5's provisions, except for the restriction on candidates announcing their views on disputed legal and political issues, were narrowly tailored to serve a compelling state interest in maintaining the independence and impartiality of Minnesota's judiciary, did not offend equal protection, and were not impermissibly vague. Republican Party v. Kelly, 63 F. Supp. 2d 967, 974-83 (D. Minn. 1999). As to the "announce" clause, the court concluded that a broad reading of the clause would raise constitutional difficulties. The court construed the clause narrowly to uphold its constitutionality, however, predicting that the Minnesota Supreme Court would do the same. Id. at 983-86. We affirm.

I.

The Minnesota Constitution provides that judges "shall be elected by the voters from the area which they are to serve," and that their term of office shall be six years. Minn. Const. art. 6, § 7. In 1912, the Minnesota General Assembly designated judicial elections as nonpartisan, meaning that party affiliation is not listed when candidates file for office, nor does it appear on the ballot. Act of June 19, 1912, ch. 2, 1912 Minn. Laws Spec. Sess. 4-6.

Ethical codes restricting the campaign conduct of judicial candidates have existed in Minnesota since at least 1950, when the Minnesota District Judges Association adopted by unanimous vote the ABA's Canons of Judicial Ethics (1924). In 1974, the Minnesota Supreme Court promulgated a code of judicial conduct that was based in large measure on the ABA's Model Code of Judicial Conduct (1972). Over the years, the Minnesota Supreme Court has revised its ethical rules, including those

---

[1]The Honorable Michael J. Davis, United States District Judge for the District of Minnesota.

relating to a candidate's ability to attend and speak at political gatherings, to solicit campaign funds, and to discuss certain topics.

Gregory Wersal, a Minneapolis-area attorney and longtime member of the Republican Party of Minnesota, ran unsuccessfully for the office of Associate Justice of the Minnesota Supreme Court in 1996 and 1998. The year Wersal launched his first campaign, the Minnesota Supreme Court revised its code of judicial conduct. The court renumbered and reorganized the canons and made several substantive changes, bringing the code largely in line with the 1990 version of the ABA's Model Code of Judicial Conduct.

Wersal interpreted one revision to lift a twenty-two-year ban on judicial candidates speaking to partisan political gatherings. From 1974 until 1996, Canon 7 of the Minnesota Code of Judicial Conduct barred candidates and judicial incumbents from speaking at partisan political gatherings, but allowed them to accept invitations to speak on their own behalf to other groups. Canon 7(A)(2) (1974) (a judicial candidate or incumbent "may accept invitations to attend and speak on his own behalf at other than partisan political gatherings"). It also prohibited judges from engaging in political activity except on behalf of measures to improve the law or the legal system. Canon 7(A)(4) (1974). In the 1996 revisions, the Minnesota Supreme Court reorganized and revised the subsections of Canon 7 and renumbered it as Canon 5. One subsection of the newly revised Canon 5 allowed candidates and judges to speak on their own behalf to gatherings generally, while another prohibited candidates and incumbents from attending political events. Canon (5)(A)(1)(a) & (d) (1996).

Consistent with his reading of the canon, Wersal, his wife Cheryl, and members of his campaign committee spoke at Republican Party gatherings as part of Wersal's 1996 bid for office. At these gatherings, they announced that Wersal was a member of the Republican Party and that he favored strict construction of the Constitution. They distributed campaign literature criticizing several Minnesota Supreme Court

decisions on issues such as crime, welfare, and abortion as being "marked by their disregard for the Legislature and lack of common sense." In addition, the campaign committee sought unsuccessfully to obtain an endorsement by the Republican Party.[2]

In May 1996, a delegate to a Republican district convention filed an ethical complaint against Wersal with the Office of Lawyers Professional Responsibility. The Office of Lawyers Professional Responsibility, under the direction of the Minnesota Lawyers Professional Responsibility Board (collectively, the Lawyers Board), investigates and prosecutes ethical violations of lawyer candidates for judicial office. The complainant questioned the propriety of Wersal's attendance at Republican gatherings, the campaign committee's solicitation of partisan support, and the campaign materials critical of Minnesota Supreme Court decisions. The Director of the Lawyers Board dismissed the complaint, concluding that no disciplinary action was warranted under Canon 5.

In the Director's written determination, she first noted that it was unclear whether the Minnesota Supreme Court had intended to retain the ban on candidates speaking to political gatherings when it revised the code in 1996. Second, she pointed out that the 1996 version of Canon 5 restricted only candidates, and not their campaign committees, from soliciting publicly stated support. Finally, the Director expressed

---

[2]At least in recent times, it has not been the norm in Minnesota for judicial candidates to seek political party endorsements or for political parties to consider endorsing them. The parties submitted no evidence that other judicial candidate campaign committees sought or were considered for such endorsements. In a February 10, 1998 letter, Wersal wrote a newspaper editor that "the Republican Party had never endorsed a judicial candidate before," and a June 20, 1998 Minnesota newspaper article characterized the Party's deliberation over whether to endorse Wersal as "a historic break with tradition." Party endorsements may not have been uncommon early in the twentieth century. See Moon v. Halverson, 288 N.W. 579, 581-82 (Minn. 1939) (Loring, J., concurring) (commenting on recent allegations of party treason directed at judges who issued decisions contrary to endorsing party's interests).

doubts about the applicability of the announce clause to Wersal's campaign statements. Citing several decisions from other jurisdictions in which similar language was either struck down or interpreted narrowly, she also questioned whether the clause was enforceable.

Ethical complaints are deemed confidential in Minnesota, but notification of the Director's initial determination whether a complaint should be dismissed summarily or investigated further is provided to the complainant and to the respondent lawyer. Sometime after Wersal received this notification, he withdrew his candidacy for the 1996 race, fearing that further ethical complaints would jeopardize his ability to practice law. In January of the following year, Wersal announced his candidacy for a supreme court seat opening up in 1998, and he and his campaign committee began campaigning as they had in the 1996 race, including the campaign committee's pursuing the Republican Party endorsement.

The Minnesota Board on Judicial Standards (the Judicial Board), the body charged with enforcing ethical codes against judges, petitioned the Minnesota Supreme Court in September 1997 to amend Canon 5, primarily to clarify the nonpartisan nature of judicial elections. The Judicial Board, which had become aware that Wersal's campaign committee was soliciting a political party endorsement, urged the court to add language that would limit the ability of candidates to identify themselves as members of a political organization and that would prevent campaign committees from seeking endorsements from political organizations. The Judicial Board also recommended that the court clarify that judicial candidates could not speak to political gatherings. Following a hearing, the court adopted each of these recommendations. Order Amending Canon 5 of the Code of Judicial Conduct, No. C7-81-300 (Dec. 23, 1997). The changes took effect January 1, 1998.

In February 1998, Wersal sought an advisory opinion from the Lawyers Board. He asked whether the Board would prosecute him for ethical violations if he spoke at

political party gatherings or sought a Republican Party endorsement. He also inquired whether the Board would enforce the provision of Canon 5 restricting candidates from announcing their views on disputed issues. The Director answered by stating that Wersal would be subject to discipline regarding the first two actions he proposed, but that the Board could not advise him on the latter question since Wersal had not provided the Board with information about any particular statements he wished to make that might have been a view on a disputed legal or political issue. The Director also stated that the Board continued to have "significant doubts as to whether or not [the announce clause] would survive a facial challenge to its constitutionality" and that it would not enforce the provision unless the speech at issue violated other portions of the judicial ethics code.

A few days after he received this advisory opinion, Wersal filed this complaint under 42 U.S.C. § 1983 (1994), seeking declaratory and injunctive relief from the provisions of Canon 5. Joined as plaintiffs were the Republican Party of Minnesota (the Party), its affiliated organizations,[3] and several other individuals and organizations interested in Wersal's candidacy.[4] The complaint alleged that Canon 5 violated the free

---

[3]These affiliated organizations included the Indian Asian American Republicans, the Republican Seniors, the Young Republicans League of Minnesota, and the Minnesota College Republicans. The Minnesota African American Republican Council and the Muslim Republicans, also affiliated organizations, were later added as plaintiffs.

[4]Other plaintiffs included Wersal's campaign committee, and Party members Cheryl Wersal, Mark Wersal, and Corwin Hulbert. Michael Maxim, another member of the Minnesota Republican Party, and Kevin Kolosky, also a candidate for judicial office in 1996 and 1998, later joined as plaintiffs. Because the Party, its affiliated organizations, and its members Cheryl Wersal, Mark Wersal, and Corwin Hulbert have filed a single brief, we refer only to the Party when addressing their arguments. Likewise, we refer only to Gregory Wersal when addressing his contentions, those of Kolosky, and the campaign committee, who also have submitted a single brief.

speech and association guarantees of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment.

Wersal and the other plaintiffs moved for a temporary restraining order and/or preliminary injunction to enjoin the Lawyers Board and Judicial Board from enforcing Canon 5 so that Wersal would be free to participate in Republican precinct caucuses scheduled for early March 1998. The district court denied the motion,[5] and we subsequently affirmed. Republican Party v. Kelly, 966 F. Supp. 875 (D. Minn. 1998), aff'd, No. 98-1625 (8th Cir. Nov. 2, 1998).

While appeal of the district court's order was pending, Wersal continued his campaign, but was forced to cancel the numerous speaking engagements he had scheduled at the precinct caucuses and other Republican events. He wrote at least five persons who he knew intended to advocate his candidacy at these events and asked them not to do so because of his concern that someone might infer that he had "knowingly permitted" them to do so in violation of Canon 5. On advice of counsel, he declined to answer questions posed by members of the press and public when he thought answering might impermissibly disclose his views on disputed issues. His wife Cheryl and his brother Mark, a member of his campaign committee, refrained from taking part in certain campaign activities on Wersal's behalf for fear that their action would subject Wersal to discipline.

At the state Republican convention held in June, Michael Maxim, a delegate who was later joined as a plaintiff in this case, moved that the Party endorse Wersal.

_____

[5]The district court found that the plaintiffs established a likelihood of success on their claim that the announce clause was unconstitutional, but concluded that the State's interest in maintaining a nonpartisan judicial election weighed against enjoining enforcement of all of Canon 5. Republican Party v. Kelly, 966 F. Supp. 875, 879-80 (D. Minn. 1998).

After considerable debate, the motion failed by a vote of 344 to 390. No other candidates for judicial office were nominated for endorsement. Because of the Republican Party's policy of not supporting candidates it had not formally endorsed, the Party did nothing to further Wersal's bid for office. His campaign ended when he came in third in the primary.

The parties filed cross motions for summary judgment. The district court found in favor of defendants on all claims. Republican Party v. Kelly, 63 F. Supp. 2d 967 (D. Minn. 1999). The court concluded that the State had compelling interests in maintaining the actual and apparent integrity and independence of the judiciary and that the restrictions on candidates' political activity and fund solicitation were narrowly tailored to serve those interests. Id. at 974-80. It also upheld the provisions against vagueness and equal protection challenges. Id. at 980-82. In its analysis of the announce clause, the court determined that the critical issue was whether the provision was narrowly tailored to serve the State's interest in maintaining the integrity and independence of the judiciary. The district court construed the clause to reach only the discussion of issues likely to come before the court, having considered that the Judicial Board had argued for a narrow interpretation of the clause and that the Minnesota Supreme Court, when possible, construes laws to prohibit their application to constitutionally protected expression. Id. at 985-86. The court then concluded that the provision did not offend the First Amendment. Id. at 986.

Wersal and those joined with him appeal,[6] challenging the determinations made by the district court.

## II.

We review the district court's grant of summary judgment de novo, applying the same standard the district court applied to the motion. Essco Geometric v. Harvard Indus., 46 F.3d 718, 729 (8th Cir. 1995). We will affirm if we conclude there are no genuine issues of material fact and the Lawyers and Judicial Boards are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

---

[6]For the first time on appeal, the Lawyers and Judicial Boards contend that the plaintiffs who are not candidates for judicial office and cannot be sanctioned by the Boards lack standing to challenge Canon 5. Citing Laird v. Tatum, 408 U.S. 1 (1972), the Boards argue that the plaintiffs' voluntary decisions not to advocate Wersal's candidacy do not constitute legally cognizable injuries. However, the plaintiffs have alleged more than the subjective "chilling" of their free speech rights held insufficient by the Supreme Court in Tatum, 408 U.S. at 13-14. Wersal and the other plaintiffs have stated they were unable to associate with each other at political party gatherings and alleged they would have done so absent the ethical restrictions. Deprivation of the right to associate with others politically is a cognizable "injury in fact." See Lerman v. Board of Elections, 232 F.3d 135, 143 (2d Cir. 2000), petition for cert. filed (U.S. Feb. 28, 2001) (No. 00-1360); Krislov v. Rednour, 226 F.3d 851, 858 (7th Cir. 2000), cert. denied, 121 S. Ct. 1085 (2001) (No. 00-923). Because the plaintiffs' associational injuries are fairly traceable to Canon 5 and the injunctive relief they request will redress them, the plaintiffs have standing to assert their claims. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (Article III standing requires plaintiffs allege "injury in fact" fairly traceable to defendant's conduct likely to be redressed by favorable court decision); National Solid Waste Management Ass'n v. Williams, 146 F.3d 595, 598 (8th Cir. 1998).

The plaintiffs contend that Canon 5 contravenes their First Amendment rights to freedom of speech and of association, made applicable to the States by the Due Process Clause of the Fourteenth Amendment. Tashjian v. Republican Party, 479 U.S. 208, 214 (1986).

Freedom of speech reaches its high-water mark in the context of political expression. Debate about the qualification of candidates for public office is at the core of our First Amendment freedoms, Eu v. San Francisco County Democratic Cent. Comm., 489 U.S. 214, 222-23 (1989), valuable not only as a personal liberty, but also because of the role it plays in the proper functioning of our entire democratic form of government. Burson v. Freeman, 504 U.S. 191, 196 (1992); Brown v. Hartlage, 456 U.S. 45, 52-53 (1982); Buckley v. Valeo, 424 U.S. 1, 14-15 (1976) (per curiam). The closely related right of association is also particularly acute in the context of elections. Eu, 489 U.S. at 224-25 (ban on endorsement in primary election acts at "crucial juncture" to prevent parties from promoting candidates who can translate shared ideas into action); Buckley, 424 U.S. at 15.

But even among restrictions that touch upon the core First Amendment rights to political speech and association, some restrictions are more burdensome than others, depending on the kind of activity that is restrained and on the nature of the restraint. See Timmons v. Twin Cities Area New Party, 520 U.S. 351, 358 (1997) (standard of review depends on character and magnitude of burden on associational rights). In Buckley v. Valeo, both campaign contribution limits and expenditure limits affected core First Amendment expression and association interests, 424 U.S. at 14, yet the contribution limits placed a lesser burden on those interests than the expenditure limits did, id. at 19-23. Consequently, contribution limits have been reviewed under a less demanding standard. Nixon v. Shrink Mo. Gov't PAC, 120 S. Ct. 897, 903-04 (2000).

In this case, the restriction applies to conduct of candidates for judicial office.[7] There are important differences between judicial office, on the one hand, and legislative or executive office, on the other, that affect the nature of the candidate's interest in certain kinds of policy debate.

> The functioning of the judicial system differs markedly from those of the executive and legislative. In those areas, the public has the right to know the details of the programs that candidates propose to enact into law and administer. Pledges to follow certain paths are not only expected, but are desirable so that voters may make a choice between proposed agendas that affect the public. By contrast, the judicial system is based on the concept of individualized decisions on challenged conduct and interpretations of law enacted by the other branches of government.

Stretton v. Disciplinary Bd., 944 F.2d 137, 142 (3d Cir. 1991). Accord Buckley v. Illinois Judicial Inquiry Bd., 997 F.2d 224, 228 (7th Cir. 1993) ("Judges remain different from legislators and executive officials . . . in ways that bear on the strength of the state's interest in restricting their freedom of speech."); In re Chmura, 608 N.W.2d 31, 39-40 (Mich.) ("[T]he differences between judges and other government officials bear on the strength of the state's interest in restricting political speech."), cert. denied, 121 S. Ct. 77 (2000). Whereas affiliation with a partisan program is thus at the heart of executive and legislative campaigns, a State may conclude that it has no role in judicial campaigns because of the neutral, decision-making nature of the judicial function. "Because the judicial office is different in key respects from other offices, the state may regulate its judges with the differences in mind . . . . [The judicial candidate] cannot, consistent with the proper exercise of his judicial powers, bind himself to decide particular cases in order to achieve a given programmatic result." Morial v. Judiciary Comm'n, 565 F.2d 295, 305 (5th Cir. 1977). The judicial candidate simply does not have a First Amendment right to promise to abuse his office. See Brown, 456

---

[7]We discuss the claim that Canon 5 also reaches the conduct of persons who are not judicial candidates infra at 36-38.

U.S. at 54-56 (some kinds of campaign promises "may be declared illegal without constitutional difficulty"); In re Kaiser, 759 P.2d 392, 400 (Wash. 1988) (holding statements of party affiliation do not refer to subject relevant to judicial qualification and therefore are not protected by First Amendment). Recognizing that the judiciary has a different job to do, Minnesota has provided that its judicial offices are nonpartisan. Minn. Stat. § 204B.06, subd. 6 (1998); Peterson v. Stafford, 490 N.W.2d 418, 420 (Minn. 1992). Thus, restrictions on Minnesota judicial candidates' speech are entirely different from limitations on the speech of candidates for partisan office, such as those in Eu, 489 U.S. at 217 (striking statute making it misdemeanor for primary candidates to claim endorsement by party).

Another important aspect of the restraint in this case is that it does not discriminate in favor of one viewpoint or other. Minnesota's restraint of judicial candidates' First Amendment rights is a straightforward restriction of expression, rather than being incidental to some other type of regulation, such as a content-neutral time, place, or manner restriction, and in one sense, it is not content-neutral because it restricts speech on the basis of subject-matter. In Burson v. Freeman, 504 U.S. 191 (1992), the Supreme Court considered a state law establishing a 100-foot "campaign-free" zone around polling places. Justice Blackmun rejected the assertion that the law was content-neutral: "Whether individuals may exercise their free speech rights near polling places depends entirely on whether their speech is related to a political campaign." Id. at 197. Similarly, in this case, the bans on accepting political party endorsements, attending political party gatherings, identifying oneself as a party member, announcing views on disputed legal and political issues, and soliciting funds depend entirely on the subject matter of the speech. See Hill v. Colorado, 120 S. Ct. 2480, 2500 (2000) (Souter, J., concurring) (government held to very exacting and rarely satisfied standard when it disfavors discussion of particular subjects or articulation of particular viewpoints).

However, the restriction in this case avoids discriminating against a particular viewpoint, which is the most serious threat to First Amendment rights. See R.A.V. v. City of St. Paul, 505 U.S. 377, 387-90 (1992) (treating "content discrimination" not as an evil in itself, but as evidence that "official suppression of ideas is afoot"). In United States Civil Service Commission v. National Association of Letter Carriers, 413 U.S. 548 (1973), the Supreme Court entertained a challenge to the Hatch Act, which prohibited federal employees from taking an active part in political management or political campaigns. The Court prefaced its analysis with the observation that the challenged restrictions did not discriminate on the basis of viewpoint:

> The restrictions so far imposed on federal employees are not aimed at particular parties, groups, or points of view, but apply equally to all partisan activities of the type described. They discriminate against no racial, ethnic, or religious minorities. Nor do they seek to control political opinions or beliefs, or to interfere with or influence anyone's vote at the polls.

Id. at 564. Accord Morial, 565 F.2d at 301-02 (requirement that sitting judge resign before running for a non-judicial office did not penalize belief in any particular idea and therefore did not touch core First Amendment values). Thus, although Canon 5 does burden First Amendment rights, the burden is less onerous than it might otherwise be because Canon 5 does not discriminate on the basis of viewpoint and because it governs only judicial elections.

Because the restrictions on the employees' rights in Letter Carriers were similar to those of Canon 5, the defendants suggest we look to Letter Carriers and cases following it, which judged restrictions on speech of government employees under a balancing test less rigorous than strict First Amendment scrutiny. See Letter Carriers, 413 U.S. at 564. Wersal argues that we cannot apply the Letter Carriers balancing test to a restriction on his speech because he is not a government employee. But even

-18-

though he is not presently a government employee, Canon 5 applies to him only insofar as he seeks to become one. The State can reasonably conclude that Wersal's actions as a candidate could affect his actions as a judge if he is elected, see Buckley v. Valeo, 424 U.S. at 26-27 (discussing danger of corruption from contributions to "current and potential office holders"), and so the reasoning of the balancing test cases fairly applies to him. However, the restrictions in this case are different from the Hatch Act provisions challenged in Letter Carriers because, while the Hatch Act restrained political activity of government employees, Canon 5 restrains the activity of candidates engaged in an election contest. The burden on the plaintiff in either case may be comparable, but the public's interest in free speech is greater where the person subject to restrictions is a candidate for public office, about whom the public is obliged to inform itself. Therefore, we will invoke strict scrutiny and examine the restrictions at issue to determine whether they are narrowly tailored to serve a compelling state interest.[8] See Stretton, 944 F.2d at 141-42; see generally California Democratic Party v. Jones, 120 S. Ct. 2402, 2412 (2000); Burson, 504 U.S. at 198; Brown, 456 U.S. at 53-54.

### III.

The governmental interests put forth to justify Canon 5 are undeniably compelling. The Boards contend that the restrictions are necessary to guarantee the independence of the Minnesota judiciary, which in turn is crucial to preserve the justice of its courts of law and its citizens' faith in those courts. There is simply no question but that a judge's ability to apply the law neutrally is a compelling governmental interest of the highest order.

---

[8]The effects of Canon 5 on speech and associational rights, respectively, are so closely intertwined that, having decided to apply strict scrutiny because of the effects on speech, we need not consider whether the effects on associational rights alone would have called for a less rigorous standard.

Judges should decide cases in accordance with law rather than with any express or implied commitments that they may have made to their campaign supporters or to others . . . . Justice under law is as fundamental a part of the Western political tradition as democratic self-government and is historically more deeply rooted, having been essentially uncontested within the mainstream of the tradition since at least Cicero's time . . . .

Buckley v. Illinois Judicial Inquiry Bd., 997 F.2d 224, 227 (7th Cir. 1993). Accord Stretton v. Disciplinary Bd., 944 F.2d 137, 142 (3d Cir. 1991) ("There can be no question . . . that a state has a compelling interest in the integrity of its judiciary . . . . If judicial candidates during a campaign prejudge cases that later come before them, the concept of impartial justice becomes a mockery."); Morial v. Judiciary Comm'n, 565 F.2d 295, 302 (5th Cir. 1977) ("Ours is an era in which members of the judiciary often are called upon to adjudicate cases squarely presenting hotly contested social or political issues. The state's interest in ensuring that judges be and appear to be neither antagonistic nor beholden to any interest, party, or person is entitled to the greatest respect.").

The plaintiffs contend that Minnesota has no interest in the independence of its judiciary because it has chosen to make its judges stand for election. Wersal says: "Contrary to popular understanding—even among lawyers—Minnesota does not have an 'independent' judiciary. Minnesota has an elected judiciary that its founding citizens specifically adopted in the Minnesota Constitution to insure its judiciary was not 'independent' from the voters." Wersal argues that when the citizens at the Democratic[9] Minnesota constitutional convention in 1857 debated whether the judiciary should be

---

[9]In Minnesota there were two constitutional conventions, one Democratic and one Republican. The two drafts resulting from those conventions were consolidated and then submitted for ratification. Peterson v. Stafford, 490 N.W.2d 418, 420 n.10 (Minn. 1992).

appointed or elected, they considered the then-recent <u>Dred Scott</u>[10] decision. They decided to choose judges by election and to give them finite terms, rather than life tenure, in order to retain the ability to oust unsatisfactory judges.

The Minnesota Supreme Court has considered the broad history of Minnesota judicial elections and has concluded that the State has historically pursued the ideal of an independent judiciary. In <u>Peterson v. Stafford</u>, 490 N.W.2d 418 (Minn. 1992), the Minnesota Supreme Court considered an equal protection challenge to Minn. Stat. § 204B.36, subds. 4 and 5 (1990), which provided that an incumbent judge should be designated as such on the ballot. In explaining the reason for the designation, the court identified the underpinnings of the Minnesota selection process as the search for an independent judiciary:

> The methods by which the federal system and other states initially select and then elect or retain judges are varied, yet the explicit or implicit goal of the constitutional provisions and enabling legislation is the same: to create and maintain an independent judiciary as free from political, economic and social pressure as possible so judges can decide cases without those influences[11] . . . . While the framers of our state constitution have developed a system of selection and election quite different from that federal scheme, they too designed a plan to recognize the uniqueness and independence of the state judiciary.

<u>Id.</u> at 420. <u>Peterson</u> traced the history of the Minnesota judicial selection process beginning with the adoption of the Minnesota Constitution in 1857, which provided that judges of the Supreme Court should be elected for seven-year terms, Minn. Const. art.

---

[10]<u>Dred Scott v. Sandford</u>, 60 U.S. (19 How.) 393 (1856).

[11]The Minnesota Supreme Court has thus with great precision and specificity answered the dissent's rhetorical question, "Independent from what?" <u>Infra</u> at 59.

-21-

6, § 3 (1857), so that judicial elections did not coincide with elections for other offices. 490 N.W.2d at 420. Moreover, the 1857 Constitution provided that judges must be "learned in the law." Minn. Const. art. 6, § 5 (1857). "Implicit in this requirement is recognition that those elected as judges will be subject to the restrictive canons of conduct governing the profession of law." 490 N.W.2d at 422. The term length was reduced to six years in 1883, which made more apparent the "difficulties associated with partisan judicial elections." Id. at 420. In 1912, the legislature enacted nonpartisan ballot legislation, Act of June 19, 1912, ch. 2, 1912 Minn. Laws, Spec. Sess. 4-6, which made the State's judicial offices nonpartisan. See id. at § 182. The court characterized this reform as an attempt to ensure the "judicial impartiality required to decide cases free from political maneuvering." 490 N.W.2d at 422.

Further, the Minnesota Constitution provided that whenever there was a judicial vacancy, the governor should appoint the successor, who would serve until his successor was elected.[12] Minn. Const. art. 6, § 10 (1857). In 1972, at the time when the State was studying the possible advantages of a merit selection plan, the time frame for this successor election was extended from the next general election occurring more than thirty days after the vacancy to the next general election occurring more than one year following the vacancy, in order to allow the electorate enough time to assess the new judge's competence. Minn. Const. art. 6, § 8 (amended 1972); see Peterson, 490 N.W.2d at 422-23.

In the context of this history, Peterson held that the ballot designation of the incumbent was rational:

---

[12]Since 1991 a judicial selection commission, which is composed of members appointed by the governor and by the justices of the supreme court, evaluates the merits of applicants for mid-term vacancies and recommends to the governor three to five nominees for each open position. Minn. Stat. §§ 480B.01, subds. 2, 8-11 (1998).

It seems clear that Minnesota has adopted its own middle-of-the-road approach to judicial selection. The open election process has been retained, but with a quasi-retention feature which simply informs the voter who the incumbent candidate is and who the challenger is. This arrangement acts as a check on the gubernatorial appointment process by keeping the ultimate choice with the voters while, at the same time, recognizing the unique independent nature of the judicial function.

490 N.W.2d at 425. Thus, the Minnesota Supreme Court has considered in depth the history and structure of Minnesota judicial elections procedures and has concluded that they are designed in large part to protect the independence of the State's judiciary.[13]

Other courts considering the same question have held that the decision to elect judges cannot be regarded as abandonment of a State's interest in an independent judiciary. See Buckley, 997 F.2d at 227 ("Judges remain different from legislators and

---

[13]The dissent concludes that Peterson's use of the phrase "independent 'as possible,'" infra at 67, must be viewed, not in light of Peterson's detailed historical review, but rather in light of the dissent's independent review of Minnesota history. See infra at 59-66. The deference we must give to state court opinions on matters of state law does not allow us to supplant Peterson's considered views in favor of our own de novo interpretation, nor may the dissent. The dissent also states that Canon 5 "subverts" Minnesota's policy, infra at 66, and seemingly presumes that Canon 5 is not part of state law because it emanates from the state supreme court, rather than from the state legislature. No one, including the dissent, has questioned the authority of the Minnesota Supreme Court to promulgate ethical rules for incumbent judges and judicial candidates. The same federalism principles which require us to defer to state courts' interpretations of state law and to recognize that state laws embody the will of a State also dictate that we recognize Canon 5 as a regulation that expresses Minnesota's will as a sovereign entity. See Bush v. Gore, 121 S. Ct. 525, 534 (2000) (Rehnquist, C.J., concurring) ("in ordinary cases, the distribution of powers among the branches of a State's government raises no questions of federal constitutional law, subject to the requirement that the government be republican in character").

executive officials, even when all are elected . . . ."); <u>Stretton</u>, 944 F.2d at 142 ("The fact that a state chooses to select its judges by popular election . . . does not signify the abandonment of the ideal of an impartial judiciary carrying out its duties fairly and thoroughly."); <u>In re Chmura</u>, 608 N.W.2d 31, 39-40 (Mich.) ("By providing for the election of judges, the people of Michigan have not transformed judges into legislators or executives . . . ."), <u>cert. denied</u>, 121 S. Ct. 77 (2000).

The governmental interest in an independent and impartial judiciary is matched by its equally important interest in preserving public confidence in that independence and impartiality.  <u>See</u> <u>Cox v. Louisiana</u>, 379 U.S. 559, 565 (1965) ("A State may also properly protect the judicial process from being misjudged in the minds of the public."); <u>Suster v. Marshall</u>, 149 F.3d 523, 532 (6th Cir. 1988) (State's interest in preventing judicial corruption or appearance of corruption compelling); <u>cf.</u> <u>Reeder v. Kansas City Bd. of Police Comm'rs</u>, 733 F.2d 543, 547 (8th Cir. 1984) ("It is proper for a state to insist that the police be, and appear to be, above reproach, like Caesar's wife.").  <u>Letter Carriers</u> stressed that the appearance of corruption resulting from partisan activities of government employees could affect the entire government:  "[I]t is not only important that the Government and its employees in fact avoid practicing political justice, but it is also critical that they appear to the public to be avoiding it, if confidence in the system of representative Government is not to be eroded to a disastrous extent."  413 U.S. at 565.

Finally, a State has an interest in protecting its judges from pressure to participate in partisan activities, if it reasonably concludes that this protection is necessary to retain a high caliber of judges.  "There could hardly be a higher governmental interest than a State's interest in the quality of its judiciary."  <u>Landmark Communications, Inc. v. Virginia</u>, 435 U.S. 829, 848 (1978) (Stewart, J., concurring in judgment).  <u>Letter Carriers</u> applied an analogous principle when it justified the Hatch

Act partly on the ground that it meant to protect government employees from political pressure from their superiors. 413 U.S. at 566-67.

We therefore conclude that the Lawyers and Judicial Boards have shown compelling governmental interests[14] to justify Canon 5, and we turn to the necessity and narrow tailoring of the various restrictions found within it.

## IV.

We first address Wersal's challenge to the three provisions of Canon 5(A) that prohibit him from attending political party gatherings; from seeking, accepting, or using endorsements from a party; and from identifying himself as a member of the party,

---

[14]In arguing that the state interests we have identified are not compelling, the dissent relies on Landmark Communications, Inc. v. Virginia, 435 U.S. 829 (1978), in which the State sought to govern not the conduct of judges, but of the press in reporting on judicial disciplinary proceedings. The dissent's discussion of Landmark Communications suggests that the compelling interest we rely on is protection of judges from criticism. Infra at 79. We rely on the State's interest in its judges' integrity and independence, which requires keeping judges from doing (or appearing to do) things that compromise their neutrality, rather than keeping others from talking or writing about them. Minnesota seeks not to "shield[] judges from published criticism," infra at 80 (quoting Bridges v. California, 314 U.S. 252, 270-71 (1941)), but to prevent them from deserving such criticism. Moreover, the Supreme Court in Landmark Communications did not reject the legitimacy of the State's proffered interests in the reputation of its judiciary and the integrity of its disciplinary proceedings, but held that the State had not shown that these interests would be "seriously undermined" unless the State could use criminal sanctions against the defendant newspaper. Id. at 841, 845.

except as necessary to vote. Minn. Code of Jud. Conduct Canon 5(A)(1)(a) & (d) (1998).[15]

A.

We must determine whether these restraints protect Minnesota's interests in the integrity and quality of its judiciary. United States v. Playboy Entertainment Group, Inc., 120 S. Ct. 1878, 1891 (2000). The burden of proof rests with the State. Id. at 1888.

A threshold question is what sort of evidence the Boards must provide substantiating the threat to the governmental interest. In Nixon v. Shrink Missouri Government PAC, 120 S. Ct. 897 (2000), the Supreme Court declined to answer this question definitively, id. at 907, but gave this guidance: "The quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised." Id. at 906. The asserted danger to the governmental interest in that case, danger of corruption

---

[15]Canons 5(A)(1)(a) and (d) provide:
Each justice of the supreme court and each court of appeals and district court judge is deemed to hold a separate nonpartisan office. MS 204B.06 Subd.6.
(1) Except as authorized in Section 5B(1), a judge or a candidate for election to judicial office shall not:
> (a) act as a leader or hold any office in a political organization; identify themselves as members of a political organization, except as necessary to vote in an election.
> . . . .
> (d) attend political gatherings; or seek, accept or use endorsements from a political organization . . . .

attendant on large campaign contributions, was neither novel nor implausible, so that the State's burden was amply satisfied by its production of a state senator's affidavit and newspaper articles showing cases of apparent corruption. Id. at 907-08. The Court also assigned some evidentiary value to the passage of a campaign contribution limitation by a large margin at a referendum, which demonstrated public concern about corruption.[16] Id. at 908. The Court quoted City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 51-52 (1986), in which the city's evidence was said to be adequate, "so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses." Id. at 907 n.6. Shrink Missouri also noted the lack of evidence tending to disprove the State's theory. Id. at 908.

The idea that judicial integrity is threatened by judges deploying political organizations in connection with campaigns for judicial office is neither novel nor implausible. In Letter Carriers, the Supreme Court recognized that partisanship of governmental officials created a risk of corruption that justified the restraint of those officials' partisan activities. Although the Hatch Act applied to employees of the executive branch, the Court's reasoning could as well have been written about judges and in fact applies with even greater urgency to them:

> It seems fundamental in the first place that employees in the Executive Branch of the government, or those working for any of its agencies, should administer the law in accordance with the will of Congress, rather than in accordance with their own or the will of a political party. They are expected to enforce the law and execute the programs of the Government without bias or favoritism for or against any political party or group or the members thereof. A major thesis of the

---

[16]We held the voter initiative imposing contribution limits invalid under the First Amendment in Carver v. Nixon, 72 F.3d 633, 645 (8th Cir. 1995); consequently, its restrictions were not in force when Shrink Missouri was decided.

Hatch Act is that to serve this great end of Government—the impartial execution of the laws—it is essential that federal employees, for example, not take formal positions in political parties, not undertake to play substantial roles in partisan political campaigns, and not run for office on partisan political tickets. Forbidding activities like these will reduce the hazards to fair and effective government.

United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers, 413 U.S. 548, 563-64 (1973). Accord LaMontagne v. St. Louis Dev. Corp., 172 F.3d 555, 557 (8th Cir. 1999) (city employees), cert. denied, 120 S. Ct. 176 (1999); Reeder v. Kansas City Bd. of Police Comm'rs, 733 F.2d 533, 547 (8th Cir. 1984) (police officers); Otten v. Schicker, 655 F.2d 142, 144 (8th Cir. 1981) (same).

The restriction here was adopted by the Minnesota Supreme Court, which has consistently over time perceived partisanship as posing a particular threat to judicial integrity. Canon 7(A) of Minnesota's 1974 Code of Judicial Conduct also restricted a judicial candidate's political activities broadly, specifically permitting a candidate for elective judicial office to appear at "other than partisan political gatherings during the year in which he is a candidate." Minn. Code of Judicial Conduct Canon 7(A)(2) (1974) (emphasis added). The comments of the advisory committee accompanying the 1995 Minnesota Code of Judicial Conduct state: "Deference to the judgments and rulings of courts depends upon public confidence in the integrity and independence of judges. The integrity and independence of judges depends in turn upon their acting without fear or favor." Canon 1(A) cmt. In proposing to the court the 1997 amendments to clarify the prohibitions on partisan conduct the Judicial Board stated: "The Judicial Standards Board members believe the proposed language changes will make it clear that judicial elections are to be nonpartisan. Minnesota has a long tradition of nonpartisan judicial elections, and these changes will assure a strong, independent judiciary."

Long before the present canons were adopted, justices of the Minnesota Supreme Court had also expressed the idea that merely avoiding party designations on the ballot was insufficient to protect the Minnesota judiciary from the dangers of partisan involvement. In Moon v. Halverson, 288 N.W. 579 (Minn. 1939), a candidate for registrar of deeds, an office designated by statute as nonpartisan, had solicited and received the endorsement of a political party. The court held that the Minnesota nonpartisan statute prescribed only that the candidate's party affiliation could not appear on the ballot and that the candidate could not declare his party when filing for office. The statute did not forbid party endorsement of candidates for nonpartisan office. 288 N.W. at 581. Justice Loring, joined by Justice Olson, concurred specially to add that this statute was not sufficient to protect the State's judiciary from the dangers of partisan pressure, which he felt had been at work:

> When candidates for such offices were placed on a non-partisan ballot it was, it seems to me, the purpose of the legislature to lift the judgeships above sordid political influence and to free the candidates from obligation to a political party so that if elected they might render judicial instead of partisan political decisions on matters where party programs, party interests or even prominent party leaders might be involved. The abuse and accusations of party treason which have been heaped upon some judges in the recent past because of decisions thought to be contrary to the interests of an indorsing party ought to be evidence enough of the impropriety of party indorsements and of their purpose to induce partisan political rather than impartial judicial decisions.

Id. at 581-82.

More recently, the court in Peterson v. Stafford, 490 N.W.2d 418, 425 (Minn. 1992), stated that the nature of judicial office requires the "holder studiously to avoid partisan politics, refrain from all discussions of public issues and restrict one's

membership and participation in organization to those primarily of a professional nature."

Additionally, the Boards have adduced evidence of the necessity of reform measures in the form of affidavits by a former governor, Arne H. Carlson, and a former Chief Justice of the Minnesota Supreme Court, A. M. (Sandy) Keith. Chief Justice Keith was a member of the Minnesota Supreme Court when the Court considered and approved the amendments to Canon 5. He testified that, based on his experience, if the Minnesota Code were changed to permit partisan activity, judges would be under pressure to "decide cases in ways that would impress the judge's supporters favorably," and eventually, partisanship would damage the public's confidence in the judiciary. Governor Carlson testified: "For the public to read newspaper headlines that a political party has endorsed and will work to elect a particular candidate would greatly harm the public's confidence in the independence of the judiciary." Both Chief Justice Keith and Governor Carlson testified that they believed that allowing judicial elections to become partisan contests would discourage many qualified candidates from seeking election.

The Boards have also produced a news account of the dangers partisan elections have posed in Texas, which included interviews with witnesses who believed that judges' decisions were affected by the need for political and financial support and that the public perceived "that justice is for sale in this state." Editorials from Texas newspapers reported a public perception that rulings were influenced by campaign obligations. The testimony at the 1997 hearing before the Minnesota Supreme Court on the proposal to amend Canon 5 was replete with references to the undesirable situation existing in other States with partisan judicial elections, particularly Texas. Amendment to Canon 5 of the Code of Judicial Conduct: Hearing Before the Minnesota Supreme Court, No. C7-81-300, at 32, 36, 50, 65-68 (1997).

In contrast to the evidence amassed by the Boards, the plaintiffs have not adduced evidence tending to disprove the threat to the integrity or reputation of the judiciary from involvement with partisan politics. See Shrink Mo., 120 S. Ct. at 908. This is an issue where "a long history, a substantial consensus, and simple common sense," Burson, 504 U.S. at 211, combine to show that regulation is necessary to protect the institution of the judiciary from the dangers of partisanship and corruption. The record suffices to support the Minnesota Supreme Court's assessment that the threat of actual and apparent corruption is real and reform measures are necessary. Cf. Eu v. San Francisco Democratic Cent. Comm., 489 U.S. 214, 229 (1989) (striking ban on party endorsement of candidates in party primaries where there was no evidence that ban served purpose of preventing fraud and corruption). Additionally, there is record evidence showing that without protection from partisan pressures, the State will be less able to recruit judicial candidates of the highest caliber.

The dissent contends that Canon 5 is not necessary because it does not achieve its stated end. Infra at 82-83. The argument is not precisely that Canon 5 does not accomplish its end as far as it goes, but that it is underinclusive—in other words, that the measure does not eliminate all the conduct posing the threat the government claims to be addressing because a candidate may attend meetings of and accept endorsements from politically active groups other than political parties. The dissent contends that in cases burdening a fundamental right "failure to solve the entire asserted problem is fatal." Infra at 83 n.44 (citing 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484 (1996), and City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 418 (1993)). Wersal makes a similar argument, relying on Carey v. Brown, 447 U.S. 455 (1980), and R.A.V. v. City of St. Paul, 505 U.S. 377 (1992). These cases do not stand for such a broad rule. Generally, underinclusiveness of a speech regulation is not an independent ground for invalidating the regulation, but rather points to the possibility that the government is discriminating on the basis of content or that the government's

-31-

asserted interest is not truly pressing. See City of Ladue v. Gilleo, 512 U.S. 43, 51-53 (1994); Glickman v. Wileman Bros. & Elliott, Inc., 521 U.S. 457, 493 (1997) (Souter, J., dissenting). When underinclusiveness of a regulation betrays content-discrimination, the standard of review must be raised to strict scrutiny. For instance, R.A.V. invalidated an ordinance prohibiting fighting words directed at some groups, but not others. The Supreme Court held that the principle for distinguishing between fighting words that were prohibited by the ordinance and those that were not had nothing to do with the rationale for permitting regulation of fighting words in the first place, but instead amounted to content discrimination. Therefore, the Court could not apply the relaxed standard appropriate for review of regulations of fighting words. 505 U.S. at 386. The ordinance failed under strict scrutiny review. Id. at 395-96. In this case, we have already established that Canon 5 discriminates on the basis of content (though not on the basis of viewpoint) and that we must conduct strict scrutiny. Supra at 17-19.

In cases in which underinclusiveness of a regulation suggests that the regulation is not truly necessary to further a compelling governmental interest, the government's obligation is to "establish the empirical reality of the problems it purports to be addressing." Glickman, 521 U.S. at 443 (Souter, J., dissenting). As part of our strict scrutiny, we have determined that the State established that a candidate's use of political parties in judicial campaigns poses a real threat to the State's compelling interests. Supra at 26-31. Thus, we have already undertaken the heightened scrutiny that underinclusiveness of a regulation would suggest is necessary.

But even if the cases cited by the dissent and Wersal indicated that underinclusiveness poses a First Amendment problem in its own right, these cases concern only arbitrary underinclusiveness, which arises when the principle for distinguishing regulated conduct from non-regulated conduct does not promote the government's asserted purpose. In Carey, 447 U.S. at 457, 464, the challenged

regulation prohibited residential picketing other than labor picketing in order to protect residential privacy. In Discovery Network, 507 U.S. at 415, the city banned use of newsracks to distribute commercial handbills, but not newspapers, as a way of preventing newsracks from becoming a safety hazard and eyesore. The types of picketing and newsracks, respectively, that were regulated posed no greater threat to the asserted governmental interest than those that were exempted from regulation, and the regulations were thus invalid. See Carey, 447 U.S. at 465; Discovery Network, 507 U.S. at 424-28. In 44 Liquormart a ban on advertising alcoholic beverages was invalid where any connection between the advertising ban and the State's desired result of reducing alcohol consumption would have been "purely fortuitous." 517 U.S. at 506-07 (Opinion of Stevens, J.).

In contrast to these cases, when underinclusiveness results from a choice to address a greater threat before a lesser, it does not run afoul of the First Amendment. See, e.g., Cornerstone Bible Church v. City of Hastings, 948 F.2d 464, 470-71 (8th Cir. 1991); Stretton v. Disciplinary Bd., 944 F.2d 137, 146 (3d Cir. 1991) ("[W]e cannot say that the state may not draw a line at the point where the coercive effect [of judicial campaign fund-raising], or its appearance, is at its most intense—personal solicitation by the candidate."). Indeed, a categorical rule against underinclusiveness for its own sake would coerce governments to regulate speech more broadly than they consider necessary, which is hardly the usual goal of First Amendment jurisprudence.[17] Here, the State has shown that a candidate's use of political parties in judicial campaigns poses a greater threat to the compelling state interests than involvement of other kinds of groups. See infra at 39-40. Therefore, the State did not violate the First Amendment in so limiting Canon 5.

---

[17]It is significant that the dissent in this case first argues that the Minnesota Supreme Court has violated the Constitution in enacting Canon 5, and then makes the antithetical assertion that it has not gone far enough.

B.

As the final step of our review of the three restrictions on Wersal's political activity, we ask whether they are narrowly drawn to address the compelling state interests. See California Democratic Party v. Jones, 120 S. Ct. 2402, 2412, 2414 (2000); Brown v. Hartlage, 456 U.S. 45, 54 (1982) (restriction must operate without "unnecessarily circumscribing protected expression").

The Minnesota Supreme Court has attempted to prevent judicial candidates from incurring, or seeming to incur, debts to political parties that could compromise their independence, while allowing them alternative means of communicating subjects of valid interest to voters. Candidates may, for instance, speak to gatherings other than political organization gatherings; appear in newspaper, television, or other media advertisements supporting their candidacy; and distribute pamphlets and other promotional literature. Canon 5(B)(1). Furthermore, candidates may establish committees to campaign for them in various ways, including obtaining public statements of support (other than from political organizations). Canon 5(B)(2).

Wersal argues that since various other States and the drafters of the ABA Model Code of Judicial Conduct have not found it necessary to forbid attendance at party gatherings, acceptance of party endorsements, and identification of party affiliation, Minnesota's restrictions must be broader than necessary. But Wersal relies on the laws of States that have in fact limited political activity by measures similar to those before us.[18] There is also the authority of Letter Carriers and the other cases in which courts

---

[18]E.g., Fla. Code of Jud. Conduct Canon 7(C)(3) (imposing various limits on speaking at political gatherings, including prohibition on announcing party affiliation); Ky. Sup. Ct. R. 4.300, Canon 5(A)(2) (allowing candidate to state party affiliation only in response to direct question); Okla. Stat. Ann. tit. 20, § 1404(B)(6) (West 1991 &

held it was proper to limit partisan political activity of executive employees. See supra at 24-25.

The Party contends that the prohibition on disclosing party affiliation is not narrowly tailored because it prohibits disclosing past party affiliation as well as present. The Judicial Board states that it "simply prevents the judge from affirmatively stating his current political affiliation." However, the report submitted to the Minnesota Supreme Court at the time the party affiliation language was adopted states that it would prohibit candidates from identifying themselves "as past or present members of a political organization." The language was adopted as proposed. The Minnesota Supreme Court apparently concluded that the public would infer that identification of past membership was tantamount to identification of present membership. See In re Kaiser, 759 P.2d 392, 395 (Wash. 1988) (en banc) (concluding judge violated prohibition on stating party affiliation by stating past affiliation). It was therefore reasonable to extend the prohibition on stating party affiliation to include past affiliation as well, lest the measure be rendered ineffective.

The Party further contends that Canon 5 is not narrowly tailored because Canon 5(A)(3) applies to a candidate's supporters as well as to the candidate. Specifically, Maxim argues that he had to avoid "seeking out any relationship with Gregory Wersal" in order to avoid coming within the scope of persons who were prohibited by Canon 5(A)(3) from doing for Wersal what he could not do for himself—i.e., attending a party

---

Supp.) (making it a ground for removal of judge from office to make party affiliation publicly known in connection with campaign for office); Or. Code of Jud. Conduct JR 4-102, 4-104 and Or. Rev. Stat. § 249.015 (1999) (candidate shall not publicly identify candidate's political party membership except by registering to vote); S.D. Code of Jud. Conduct Canon 5(C)(1)(a)(ii) (permitting candidate to identify party affiliation only to vote); Wash. Code of Jud. Conduct Canon 7(A)(1)(e) (same).

gathering or seeking a party endorsement. Similarly, the members of Wersal's campaign committee contend that the restriction is overbroad because the committee was prohibited from seeking a party endorsement of Wersal. This argument has two parts: first, that the regulation is overinclusive because it affects third parties who have a relationship with Wersal; and second, that the regulation is vague because third parties cannot predict under what circumstances their actions will be imputed to Wersal.

Two district court cases have anticipated the overinclusiveness issue. In Concerned Democrats v. Reno, 458 F. Supp. 60, 65 (S.D. Fla. 1978), and California Democratic Party v. Lungren, 919 F. Supp. 1397 (N.D. Cal. 1996), courts held that state laws prohibiting political party endorsements of judicial candidates or of all nonpartisan candidates, respectively, were not narrowly tailored because they restricted the political parties' behavior when it was only necessary to restrict the candidate's behavior. Lungren assumed, arguendo, that the State had a compelling interest in preventing nonpartisan office holders from engaging in partisan activity, but held that the law "misse[d] the mark" in addressing that interest:

> The evil sought to be combatted is the unseemly partisanship of nonpartisan officeholders once they are in office, not the partisanship of political parties (which, of course, is the very nature of political parties). Section 6(b) purports to prevent officeholders from being "beholden" to political parties by imposing a ban on the parties' speech about candidates for office, rather than (as the Supreme Court approved in Letter Carriers) a ban on the partisan political conduct of the officeholders themselves. The distinction is crucial. The government has an interest in the manner in which its elected officials conduct themselves while in office. The government does not and cannot have a legitimate interest in silencing the speech of third parties about the qualifications and political views of candidates for those offices.

919 F. Supp. at 1402.

These district court cases convincingly reason that because the State's compelling interest is in the rectitude of the candidate, a narrowly tailored restriction will regulate expressions by the candidate, not third parties. However, the language of Canon 5(A)(3) is so limited. It does not purport to govern what other persons do, but what the candidate authorizes or knowingly permits them to do. The canon therefore does not affect persons not subject to the candidate's authority and control. See Johnson v. Holzemer, 116 N.W.2d 673, 679 (Minn. 1962) ("knowingly permit" extends only to persons having right of authoritative control over actor who are actually aware of his or her activity). Canon 5(A)(3) simply prohibits the candidate from accomplishing by the acts of an agent what the candidate is forbidden to personally. The Director of the Lawyers Board, the body charged with enforcing Canon 5(A)(3) in Wersal's case, confirms that there is no threat of disciplinary action without the candidate himself authorizing or permitting the action of the supporter. Insofar as Canon 5(A)(3)(a) refers to members of the candidate's family, it does not limit their activities, but rather affects the candidate's actions towards them: the candidate shall "encourage" them to adhere to the standards applicable to the candidate. As for persons who are within the candidate's authority and control as members of the candidate committees authorized by Canon 5(B)(2), they have voluntarily assumed that relation, and therefore may subject themselves to certain restraints which are necessary to make effective the restrictions on the candidate. Cf. Letter Carriers, 413 U.S. at 581-82 (Appendix to the Court's opinion) (United States Civil Serv. Comm'n Form No. 1236, which Congress intended to serve as its definition of the general proscription against partisan activities, id. at 572-74, prohibits "activity by indirection" when, by collusion or coercion, employee causes another to do what employee may not do directly). The limitation of Canon 5's reach to the candidate and to persons within the candidate's control thus

distinguishes this case from Eu, 454 U.S. at 221, in which there was an "outright ban" on political parties endorsing candidates.

The Party argues that a candidate's supporters cannot tell under what circumstances their actions will be imputed to the candidate. A restriction on speech must not be so vague that people of ordinary intelligence cannot tell what it prohibits. Broadrick v. Oklahoma, 413 U.S. 601, 607 (1973). But see Berger v. Supreme Court, No. 87-3935, 1988 WL 114792, at *3 (6th Cir. Oct. 31, 1988) (notice requirements less stringent in enforcing non-criminal code of judicial conduct than if criminal penalties at stake). Canon 5(A)(3)(c) limits the scope of its language by adding the requirement that the candidate's permission be "knowing." This requirement prevents the sort of violation by mistake the non-candidate plaintiffs claim has chilled their speech. See Chulchian v. City of Indianapolis, 633 F.2d 27, 31 (7th Cir. 1980) (ordinance prohibiting person from "permitting" conduct includes requirement that person know of conduct and therefore is not unduly vague). Moreover, both Canon 5(A)(3)(a), dealing with family members, and Canon 5(A)(3)(c), dealing with authorizing or knowingly permitting others to act, include the concept of the candidate's right to control the speaker. Johnson, 116 N.W.2d at 679. Canon 5(A)(3) is therefore not unduly vague.

C.

The Party contends that the restrictions on a candidate's partisan activity violate its rights to equal protection because Canon 5 restricts association with political parties, but not other organizations that could affect a judge's independence or the public's perception of that independence. We have already determined that the restraints on Wersal's speech and association are necessary to serve a compelling state interest. To conclude that the same restraints violate the Equal Protection Clause, we would have

to determine that Canon 5 burdens the rights of political party members more than others and that "such differential treatment is not justified." California Med. Ass'n v. FEC, 453 U.S. 182, 200 (1981). In Broadrick, in rejecting a First Amendment overbreadth challenge to Oklahoma's restrictions on partisan activities by government employees, the Supreme Court also rejected an equal protection challenge to the same law:

> Appellants also claim that § 818 violated the Equal Protection Clause of the Fourteenth Amendment by singling out classified service employees for restrictions on partisan political expression while leaving unclassified personnel free from such restrictions . . . . [T]he legislature must have some leeway in determining which of its employment positions require restrictions on partisan political activities and which may be left unregulated. And a State can hardly be faulted for attempting to limit the positions upon which such restrictions are placed.

413 U.S. at 607 n.5 (citation omitted).

Our discussion regarding the State's interest in the independence of its judiciary demonstrates how Minnesota has historically viewed partisanship as a particular threat to the integrity of its courts, supra at 28-31, and we need not reiterate this discussion. Restrictions reaching only partisan, rather than nonpartisan, political activity have been upheld in other cases. See Letter Carriers, 413 U.S. at 562; Bauers v. Cornett, 865 F.2d 1517, 1524-25 (8th Cir. 1989) (application of statutes to nonpartisan activity would have raised a different constitutional question than application to partisan activity). Political parties specialize in the business of electing candidates and have a powerful machinery for achieving that end, including large membership and fund-raising organizations. Those parties are simply in a better position than other organizations to hold a candidate in thrall. Moreover, because political parties have comprehensive platforms, obligation to a party has a great likelihood of compromising

a judge's independence on a wide array of issues. Finally, legislatures are bodies in which, for the most part, the members owe allegiance to a political party, not only for financial support and endorsement in their campaigns for office, but also for political support within the legislative process itself. No single legislator has the power to enact laws. Therefore, the sharing of common partisan affiliation plays an integral role in enactment of legislation. If the judiciary is then expected to review such legislation neutrally, a State may conclude that it is crucial that the judges not be beholden to a party responsible for enactment of the legislation, or to one that opposed it.

It is also relevant that a judge's participation in associations other than political parties is regulated by Canon 4, which imposes broad requirements that judges avoid involvement that could cast doubt on their impartiality or interfere with proper performance of their judicial duties. At the Minnesota Supreme Court's 1997 hearing on amending Canon 5, DePaul Willette, Executive Secretary of the Judicial Board, testified that the danger of judicial candidates affiliating with single-issue interest groups was adequately addressed by the provision of Canon 5 prohibiting announcement of the candidate's views on disputed legal or political issues, Canon 5(A)(3)(d)(i). <u>Amendment of Canon 5 of the Code of Judicial Conduct: Hearing before the Minnesota Supreme Court</u>, No. C7-81-300, at 12-13 (1997).

We conclude that the State has justified its differential treatment imposing greater restrictions on a judicial candidate's partisan political activities than on association with other kinds of organizations.

V.

We turn next to Wersal's claim that Canon 5's "announce" clause, which prohibits judicial candidates from announcing their "views on disputed legal or political

issues,"[19] violates his free speech rights because it is not narrowly tailored to achieve any compelling state interest.[20] We have already determined that the interests proffered by the State to justify this restriction are compelling governmental interests of the highest order, so we proceed to the next step of our inquiry and address whether the restriction is necessary to further these interests. See United States v. Playboy Entertainment Group, Inc., 120 S. Ct. 1878, 1891 (2000); see also Brown v. Hartlage, 456 U.S. 45, 53-54 (1982).

A.

As we have discussed, it is consistent with the essential nature of campaigns for legislative and executive offices for candidates to detail and make promises about the programs that they intend to enact into law and to administer. For judicial officers,

---

[19]Canon 5(A)(3)(d)(i) provides that a judge or a candidate for judicial office shall not:

> (i) make pledges or promises of conduct in office other than the faithful and impartial performance of the duties of the office; announce his or her views on disputed legal or political issues; or misrepresent his or her identity, qualifications, present position or other fact, or those of the opponent.

[20]Wersal also challenges the announce clause as being vague. However, his argument is based solely on the clause's relationship to Canon 5(A)(3), which prevents him from "knowingly permit[ting]" others to announce his views on his behalf. We have already held supra at 38 that the "knowingly permit" language is not unconstitutionally vague, and we therefore reject this claim. Furthermore, our clarification of the "knowingly permit" language is dispositive of the Party's claim that the announce clause is unconstitutional as applied to third parties. Candidates are subject to discipline only when third parties act as agents of the candidate or have voluntarily assumed a relationship with the candidate as a member of the candidate's campaign committee. The Code does not regulate the independent activities of third parties.

however, a State may determine that this mode of campaigning, insofar as it relates to how judges will decide cases, is fundamentally at odds with the judges' obligation to render impartial decisions based on the law and facts. At the time of the campaign, the candidate simply cannot predict what the facts or arguments in a particular case may be, the precise way in which legal issues will present themselves, or other crucial factors that need be considered before a court issues a final decision. See Berger v. Supreme Court, No. 87-3935, 1988 WL 114792, at *3 (6th Cir. Oct. 31, 1988) ("[T]he very purpose of the judicial function makes inappropriate the same kind of particularized pledges and predetermined commitments that mark campaigns for legislative and executive office.") (internal quotations omitted); Buckley v. Illinois Judicial Inquiry Bd., 997 F.2d 224, 227 (7th Cir. 1993) (free discussion of judicial candidate's views conflicts with the "historically more deeply rooted" concept of justice under the law); Stretton v. Disciplinary Bd., 944 F.2d 137, 142 (3d Cir. 1991) (prejudging cases at campaign stage makes mockery of the concept of an impartial judiciary and undermines public confidence in rule of law).

Canon 5's announce clause restrains candidates from making statements in their campaigns about their views on disputed legal and political issues, and thus prevents candidates from implying how they would decide cases that might come before them as judge. Wersal maintains that this restriction is not necessary because Canon 5 already protects the State's interests through bans on candidates making pledges or promises of conduct in office other than the faithful performance of their duties and on candidates manifesting bias or prejudice inappropriate to the judicial office. See Canon 5(A)(3)(d)(i) & (ii).

To be sure, the pledges and promises provision of Canon 5(A)(3)(d)(i) addresses the type of campaign conduct that most blatantly subverts the judicial office—pledges by candidates to make specific decisions on the bench. However, it does not reach the

full range of campaign activity that can undermine the State's interests in an independent and impartial judiciary. It would not, for example, reach declarations by candidates that legislation relating to hot-button social issues is or is not constitutional. It also would not apply to candidates who publicized their opinions about how unsettled legal issues should be resolved. Both instances raise the specter that the candidates are declaring how they would decide questions that might come before them as judges in order to gain support for their candidacies. See Laird v. Tatum, 409 U.S. 824, 836 n.5 (1972) (Rehnquist, J.) (Mem. on Motion for Recusal) ("In terms of propriety, rather than disqualification, I would distinguish quite sharply between a public statement made prior to nomination for the bench, on the one hand, and a public statement made by a nominee to the bench. For the latter to express any but the most general observation about the law would suggest that, in order to obtain favorable consideration of his nomination, he deliberately was announcing in advance, without the benefit of judicial oath, briefs, or argument, how he would decide a particular question that might come before him as a judge.").

When a candidate is later called upon as a judge to preside over cases involving disputed issues about which he or she has made campaign announcements, the judge is placed in an awkward, if not impossible, position. Should the judge properly determine, for example, that a law violates the Constitution, having already expressed this opinion during the campaign, the judge risks appearing as though he or she prejudged the case rather than gave it due consideration in light of the law, arguments, and facts. This apparent rigidity can undermine the faith of the litigants and public in the judge's decision and in the State's judicial system generally. See Stretton, 944 F.2d at 142. On the other hand, should the judge reach a conclusion that departs from the opinion expressed during the campaign, the judge risks being assailed as a dissembler. Thus, the judge may hesitate to decide the case in a way that might lose votes at the next election. Certainly, many judges have the fortitude to resist such pressures, but

we do not doubt that the potential of supporter abandonment at the next election can weigh heavily on judges who know they were elected based on representations they made during the last campaign. Cf. The Federalist No. 78, at 471 (Alexander Hamilton) (Clinton Rossiter ed. 1961) (arguing against periodic popular election of judges because it gives them "too great a disposition to consult popularity" when rendering decisions).

Wersal does not explain why he believes the canon restricting candidates from manifesting bias or prejudice inappropriate to judicial office fully protects the State's interests left unshielded by the ban on candidates making improper pledges and promises, and we conclude it does not. Canon 5(A)(3)(d)(ii) was added to the Code when the Minnesota Supreme Court updated its ethical rules and brought them closer to the 1990 version of the ABA Model Code, some twenty-two years after the announce clause was promulgated; and we do not read the two provisions to address the same conduct. The manifestation of bias provision, fairly read, is directed at words and conduct that display personal animus against persons or groups, such as women or minorities. Even if it could be construed to cover announcements about how a candidate would decide cases if elected, settled rules of statutory interpretation require that we decline to read it in this way. See Radzanower v. Touche Ross & Co., 426 U.S. 148, 153 (1976) (subsequently enacted law cast in general terms should not be interpreted to supplant one dealing with specific subject unless absolutely necessary to give effect to the language). We therefore reject any implication that the adoption of the manifestation of bias provision rendered the announce clause unnecessary.

Wersal also challenges the sufficiency of the evidence the Boards have put forth to justify this speech restriction. He argues that the State did not fulfill its evidentiary obligation as a matter of law because the Boards did not prove there was any concrete evidence showing the harmfulness of candidates announcing their views in the public

-44-

record before the Minnesota Supreme Court at the time the court adopted the announce clause. This argument misapprehends the Boards' evidentiary burden in this case.

In Nixon v. Shrink Missouri Government PAC, 120 S. Ct. 897, 907-08 (2000), for example, the Court stated that to sustain a law setting contribution limits, it was enough for the State to adduce evidence substantiating legislative concerns about the actual or perceived corruption associated with large contributions. As we have noted supra, the corroborating evidence included a state senator's sworn statement that "large contributions have 'the real capacity to buy votes,'" contemporaneous newspaper accounts tending to show public officials were actually corrupted by contributions, and the recent overwhelming passage of a statewide initiative indicating that the majority of voters had concluded that contribution limits were necessary. Id. None of these items were shown to be part of the public record before the legislature at the time the legislature enacted the law.

Burson v. Freeman, 504 U.S. 191 (1992), provides an example of the type of corroborating evidence that can support a speech restriction subject to strict scrutiny. In Burson, the Court entertained a challenge to a law establishing a 100-foot "campaign-free" zone around polling places that was designed to protect against voter intimidation and election fraud. As evidence showing that the law was necessary, the Court looked to nineteenth century ballot reforms and traced the development of restrictions on election-day electioneering. Id. at 202-05. It also noted that all fifty States limit access to areas in or around polling places. Id. at 206. Taken together, this evidence revealed a "widespread and time-tested consensus" about the problems of voter intimidation and voter fraud which corroborated the State's conclusion that some sort of "campaign-free" zone around voting compartments was necessary. Id.

In this case, the Boards have met their evidentiary burden by offering evidence of widespread and longstanding consensus among members of the bench and bar about the necessity of restrictions on campaign speech that conveys a judicial candidate's propensity to decide cases in a particular way. Three-quarters of a century ago, the ABA promulgated the nation's earliest formalized standards of professional conduct for judges, the Canons of Judicial Ethics. Canon 30 provided that a candidate for judicial office "should not announce in advance his conclusions of law on disputed issues to secure class support." Canon 30 (1924). Developed and drafted by a committee chaired by Chief Justice William Howard Taft and later approved by delegates to the ABA's 1924 annual meeting, see Jeffery M. Shaman et al., Judicial Conduct and Ethics §1.02 (3d ed. 2000), the canon reflects the views of members of the legal profession as to what ethical restrictions are needed to protect the integrity of the judiciary. Many state courts reached similar conclusions and adopted the ABA Canons for their own jurisdictions, id. at §1.02 n.14, including the Minnesota District Judges Association, whose members voted to do so unanimously at a conference in 1950.

In the early 1970s, the ABA committee charged with drafting the Model Code of Judicial Conduct included a restriction on candidate speech similar to the restriction contained in 1924 code. See ABA Model Code of Jud. Conduct Canon 7(B)(1)(c) (1972). The ABA's 1972 Model Canon 7 is the pattern on which Minnesota's announce clause is based, and a majority of States that have an elected judiciary promulgated ethical rules prohibiting candidates from announcing their views on disputed legal and political issues. See Patrick M. McFadden, Electing Justice: The Law and Ethics of Judicial Election Campaigns 85 (1990). In 1990, when the ABA revised its Model Code, it adopted a different formulation of the candidate speech restriction, but one that continues to restrict more speech than the pledges-and-promises provision. Model Canon 5 restrains candidates from making "statements that commit or appear to commit the candidate with respect to cases, controversies or issues that are likely to come

before the court." ABA Model Code of Jud. Conduct Canon 5(A)(3)(d)(ii) (1990). A number of States have revised their rules in accordance with the 1990 "commitment" canon.[21] Today, most States with an elected judiciary have campaign speech restrictions patterned after either the 1972 or 1990 ABA model canons.[22]

Minnesota Supreme Court decisions such as Moon v. Halverson, 288 N.W. 579 (Minn. 1939), and Peterson v. Stafford, 490 N.W.2d 418 (Minn. 1992), also provide insight into factors that would have informed the court's decision to adopt the announce clause. As we have discussed, in both cases Minnesota justices commented on historical problems resulting from close proximity between judicial elections and

---

[21]See, e.g., Ariz. Sup. Ct. R. 81, Canon 5(B)(1)(d)(ii); Ark. Code of Jud. Conduct Canon 5A(3)(d)(ii); Cal. Code of Jud. Ethics Canon 5(B); Fla. Code of Jud. Conduct Canon 7(A)(3)(d)(ii); Ga. Code of Jud. Conduct Canon 7(B)(1)(c); Ill. Sup. Ct. R. 67, Canon 7(A)(3)(d)(i); Kan. Sup. Ct. R. 601A, Canon 5(A)(3)(d)(ii); Ky. Sup. Ct. R. 4.300, Canon 5(B)(1)(c); La. Code of Jud. Conduct Canon 7(B)(1)(d)(ii); N.Y. Code of Jud. Conduct Canon 5(A)(4)(d)(ii); Ohio Code of Jud. Conduct Canon 7(B)(2)(d); S.D. Stat., ch. 16-2, app., Canon 5(A)(3)(d)(ii); Tenn. Sup. Ct. R. 10, Canon 5(A)(3)(d)(ii); Wash. Code of Jud. Conduct Canon 7(B)(1)(c)(ii).

[22]A few States proscribe only improper campaign pledges and promises. See, e.g., Or. Code of Jud. Conduct JR 4-102(B); Utah Code of Jud. Conduct Canon 5(C)(1). Other States impose different, yet significant speech restrictions. See, e.g., Tex. Code of Jud. Conduct Canon 5(2)(i) (no "indicat[ing] an opinion on any issue that may be subject to judicial interpretation by the [judge/candidate if elected into office], except that discussion of an individual's judicial philosophy is appropriate if conducted in a manner which does not suggest to a reasonable person a probable decision on any particular case"); Wis. Sup. Ct. R. 60.06(3) (prohibiting "suggestions of conduct in office which appeal to the cupidity or partisanship of the electing or appointing power"); see also Ala. Canons of Jud. Ethics Canon 7(B)(1)(c) (candidate "shall not announce in advance the candidate's conclusions of law on pending litigation"); Colo. Code of Jud. Conduct Canon 7(B)(1)(c) (candidate may not "announce how the judge would rule on any case or issue that might come before the judge").

partisan politics. It is reasonable to infer that the prohibition on candidates announcing their views on disputed issues was intended in part to prevent judicial campaigns from becoming routine political contests, thereby jeopardizing the independence and integrity of the State's judiciary. This inference is corroborated by evidence showing that the Minnesota Bar Association, District Judges Association, and the Conference of Chief Judges recently recommended against the adoption of the less-restrictive 1990 ABA commitment canon because of concerns that liberalizing Canon 5's speech restrictions would politicize judicial elections.

The plaintiffs have offered no contradictory evidence which might increase the need for a more extensive showing by the State. See Shrink Mo.,120 S. Ct. at 906. Wersal argues that the Lawyers Board's refusal to enforce the announce clause calls into question the Boards' attempt to demonstrate that the clause serves compelling state interests. That the Director of the Lawyers Board stated she would not prosecute violations under the clause as a matter of prosecutorial discretion until it was upheld by a court is not sufficient to increase the evidentiary burden. The Lawyers Board's determination was based on the likelihood of a constitutional challenge to the announce clause and the limited resources available to the Board for defending such a suit; it has little bearing on whether certain campaign announcements can impair or be perceived to impair judicial independence and impartiality.

The Lawyers and Judicial Boards have shown that this restriction furthers compelling governmental interests in the independence and actual and perceived impartiality of the judiciary.

B.

Having concluded the restriction furthers compelling interests, we must examine whether it is narrowly tailored. See California Democratic Party v. Jones, 120 S. Ct. 2402, 2414 (2000); Brown, 456 U.S. at 54.

The district court construed the announce clause to apply only to discussion of a candidate's predisposition on issues likely to come before the candidate if elected into office. Republican Party v. Kelly, 63 F. Supp. 2d 967, 986 (D. Minn. 1999). None of the plaintiffs claimed in their opening briefs on appeal that the district court erred by interpreting the language as it did. Wersal attempts to raise the issue in his reply brief. It is well established that issues not argued in an opening brief cannot be raised for the first time in a reply brief,[23] and we will therefore analyze the announce clause as it has been construed by the district court. We should add, however, that if the issue were properly before us, we would not find error in the district court's interpretation. The longstanding principle that courts should construe laws to sustain their constitutionality, see, e.g., Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575 (1988), the Minnesota Supreme Court's adherence to this interpretive principle, see In re R.A.V., 464 N.W.2d 507, 509 (Minn. 1991), rev'd on other grounds by R.A.V. v. City of St. Paul, 505 U.S. 377 (1992), and the Judicial Board's endorsement of the narrowed construction form a solid foundation for the

---

[23]See, e.g., United States v. Vincent, 167 F.3d 428, 432 (8th Cir. 1999), cert. denied, 120 S. Ct. 124 (1999); South Dakota Mining Ass'n v. Lawrence County, 155 F.3d 1005, 1011 (8th Cir. 1998); United States v. Davis, 52 F.3d 781, 783 (8th Cir. 1995); French v. Beard, 993 F.2d 160, 161 (8th Cir. 1993); see also United States v. Darden, 70 F.3d 1507, 1549 n.18 (8th Cir. 1995) ("Absent some reason for failing to [raise issue in opening brief], we will not consider an issue first raised in a reply brief.").

district court's conclusion. Furthermore, the interpretation accords with <u>Stretton</u>, where the Third Circuit interpreted identical language similarly. 944 F.2d at 144.[24]

As construed by the district court, the restriction prohibits candidates only from publicly making known how they would decide issues likely to come before them as judges. A similar construction was determined to be narrowly drawn in <u>Stretton</u>, 944 F.2d at 144, and we are persuaded that it is narrowly drawn here as well. These sorts of campaign announcements are (or can appear to be) calculated to show that the candidate will decide cases in a certain way if elected into office, and the implication that the candidate will carry through with his campaign announcements can haunt the candidate on the bench to the detriment of the State's judicial system. <u>See id.</u> <u>But see</u> <u>Buckley</u>, 997 F.2d at 229 (questioning whether limiting construction would significantly circumscribe scope of announce clause, giving example of civil war in Yugoslavia as likely to come before courts as persecution defense to deportation).

Wersal has stated that the restriction prohibits candidates from discussing virtually every topic related to their campaigns, and the dissent maintains that it

---

[24]In claiming error, Wersal relies heavily on <u>Buckley v. Illinois Judicial Inquiry Bd.</u>, 997 F.2d 224, 229-30 (7th Cir. 1993) where the Seventh Circuit declined to read an analogous canon narrowly. Having carefully studied both <u>Stretton v. Disciplinary Bd.</u>, 944 F.2d 137 (3d Cir. 1991), and <u>Buckley</u>, we believe that <u>Stretton</u> is more persuasive. <u>Buckley</u> gives little heed to "our task [as courts] to construe [laws] so as to comport with constitutional limitations" if consistent with the will of the lawmaker. <u>United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers</u>, 413 U.S. 548, 571 (1973). <u>Buckley</u> also distinguished <u>Stretton</u> in part due to factors not present in this case or in <u>Stretton</u>: a disciplinary body's determination that a judge violated the clause when he commented truthfully on his past record and counsel's convoluted arguments that the announce clause contained an implied "right of reply." 997 F.2d at 229.

effectively bans all campaigning. But nothing in Canon 5(A)(3)(d)(i) restricts candidates from discussing or publicizing information about their character, fitness, integrity, background (with the exception of their political affiliation), education, legal experience, work habits, and abilities, which are subjects the Minnesota General Assembly has determined to be highly relevant to a candidate's qualification for office. See Minn. Stat. § 480B.01, subd. 8 (listing criteria by which commission on judicial selection shall evaluate persons applying for judicial vacancies to be filled by gubernatorial appointment). The Minnesota Supreme Court has also indicated that candidates may discuss and state their views on how they would handle administrative duties if elected. See Bundlie v. Christensen, 276 N.W.2d 69, 72 (Minn. 1979) (no ethical violation under Canon 7(B), the precursor to Canon 5(A), when candidate made cutting costs of courtroom administration part of campaign platform); cf. Ackerson v. Kentucky Judicial Ret. & Removal Comm'n, 776 F. Supp. 309, 314 (W.D. Ky. 1991) (restraint on campaign speech about court administration would violate First Amendment).

We further believe the Minnesota Supreme Court would conclude that general discussions of case law or a candidate's judicial philosophy do not fall within the scope of the announce clause. In 1990 the Judicial Board issued an advisory opinion, which the Board has since made known to judicial candidates by letter, stating that Canon 5 does not prohibit candidates from discussing appellate court decisions. See Minnesota Bd. on Judicial Standards, Informal Op. 10/10/1990. The Judicial Board has also approved extensive lists of sample questions that interested voters could pose to judicial candidates consistent with Canon 5. These questions are wide-ranging and include such topics as a candidate's judicial philosophy, issues relating to the administration of justice in criminal, juvenile, and domestic violence cases, and the candidate's perception of a judge's role in the judicial system.

While it is true that some judicial ethics advisory bodies in other States have interpreted language identical to the announce clause to reach topics such as these, see, e.g., Berger v. Supreme Court, 598 F. Supp. 69, 74 (S.D. Ohio 1984) (disciplinary counsel's position that truthful criticisms of judicial administration and incumbents prohibited); see generally, Patrick M. McFadden, Electing Justice: The Law and Ethics of Judicial Election Campaigns 86-87 (1990) (collecting advisory opinions stating that discussion of court administration, court rules, criminal sentencing, judicial philosophy, published court decisions, etc. were improper), we believe the Minnesota Supreme Court would view the matter consistently with the Judicial Board. The Judicial Board has been intimately involved with the process of amending the Code over the years, and its views are likely to reflect those of the Minnesota Supreme Court. As the Third Circuit in Stretton put it, "[w]e would be naive not to recognize that the [Judicial Board's] position is, at the very least, a straw in the wind indicating the direction that [the supreme] court will go." Stretton, 944 F.2d at 143. Furthermore, some of the advisory opinions of other States' ethics boards conflict with the Minnesota Supreme Court's decision in Bundlie on whether the announce clause prohibits announcements about judicial administration.

Wersal cites several decisions in which courts have struck down similar canons as overly broad restrictions on speech. E.g., Buckley, 997 F.2d at 228-29; Beshear v. Butt, 863 F. Supp. 913, 917-18 (E.D. Ark. 1994); ACLU v. Florida Bar, 744 F. Supp. 1094, 1097 (N.D. Fla. 1990); J.C.J.D. v. R.J.C.R., 803 S.W.2d 953, 956-57 (Ky. 1990). However, these cases proceed on the assumption that judicial candidates are left with little to discuss and to put before the voters other than their "name, rank, and serial number," Buckley, 997 F.2d at 227, "biographical data," ACLU v. Florida Bar, 774 F. Supp. at 1098, or "professional history," J.C.J.D., 803 S.W.2d at 956, and are therefore distinguishable.

The announce clause, as construed by the district court, is narrowly tailored to further compelling governmental interests.

VI.

Wersal contends that Canon 5(B)(2),[25] which prohibits judicial candidates from personally soliciting campaign funds, violates the First Amendment because it is not narrowly tailored.

We have no difficulty in concluding that Canon 5(B)(2) is necessary to serve compelling state interests. Indeed, Wersal does not dispute these points. Raising campaign funds, a practical requirement for judicial candidates who face popular election, has been identified as presenting "the greatest of all conflicts" between necessity and judicial impartiality. See E. Wayne Thode, Reporter's Notes to Code of

---

[25]In full, Canon 5(B)(2) provides:

A candidate shall not personally solicit or accept campaign contributions or solicit publicly stated support. A candidate may, however, establish committees to conduct campaigns for the candidate through media advertisements, brochures, mailings, candidate forums and other means not prohibited by law. Such committees may solicit and accept campaign contributions, manage the expenditure of funds for the candidate's campaign and obtain public statements of support for his or her candidacy. Such committees are not prohibited from soliciting and accepting campaign contributions and public support from lawyers, but shall not seek, accept or use political organization endorsements. Such committees shall not disclose to the candidate the identity of campaign contributors nor shall the committee disclose to the candidate the identity of those who were solicited for contribution or stated public support and refused such solicitation. A candidate shall not use or permit the use of campaign contributions for the private benefit of the candidate or others.

Judicial Conduct 98 (ABA 1973).  Judges, more than officeholders in other branches of government, risk the appearance that those who contribute to their campaigns can impermissibly influence governmental processes.  When judges obtain funds from a group that has an interest in the outcome of litigation, such as the plaintiffs' or defendants' bar, judges can appear beholden to that group for their accession to office, creating the expectation that the judges will favor their benefactors accordingly.  See In re Fadeley, 802 P.2d 31, 40 (Or. 1990) ("A judge's direct request for campaign contributions offers a quid pro quo or, at least, can be perceived by the public to do so."); cf. Nixon v. Shrink Mo. Gov't PAC, 120 S. Ct. 897, 905-06 (2000) (public perception that large donors can "call the tune" for candidates can harm democratic processes); Buckley v. Valeo, 424 U.S. 1, 27 (1976) (per curiam).  Even if judges receive contributions from a broad cross-section of persons and interests, the appearance of impropriety hangs over them if they adjudicate cases in which a litigant or counsel has contributed, or refused to contribute, to their campaign.  See Stretton, 944 F.2d at 145 (noting the unseemliness of judges presiding over cases in which lawyers have helped fund judicial campaign chests).

Recognizing the unique difficulties presented by judicial campaign fundraising, Canon 5(B)(2) seeks to insulate judicial candidates from the solicitation and receipt of funds while leaving open ample alternative means for candidates to raise the resources necessary to run their campaigns.  To this end, Canon 5(B)(2) provides that candidates may establish campaign committees to conduct fundraising on their behalf.  The Code does not limit the amount individuals can contribute to the candidate's campaign fund or the amount the campaign committee may raise.  Canon 5(B)(2) imposes only two restrictions related to campaign finance on the committee:  its members cannot disclose to the candidate the identity of contributors or those who were solicited to contribute but declined, and they cannot permit the campaign funds to be used for private benefit.

Wersal's objection to this fundraising arrangement is limited: He does not challenge the campaign committee setup or the restrictions placed on the committee's members. Rather, he suggests that a narrowly tailored rule would allow candidates to solicit funds from large groups and to send out letters over their signatures requesting money. He argues that the State's concern over the corrupting influence of money on judicial candidates is fully redressed by the provision that prevents the campaign committee from revealing the identity of campaign contributors.

Wersal is correct that the knowledge-screening provision of Canon 5(B)(2) lessens several of the problems attendant on judicial campaign fundraising; we reject his conclusion, however, that it obviates the need for limitations on candidates soliciting funds from groups personally or by letter. When a judicial candidate seeks funds directly from those who stand to gain from the candidate's decisions in office, the State may conclude that his activity is incongruous with the decorum of judicial office whether or not the candidate is shielded from knowing who ultimately contributed. Particularly when candidates target groups who have pecuniary or ideological interests in litigation likely to come before the court, the mere act of solicitation can contribute to the appearance, accurate or not, that "justice is for sale" and the expectation of impermissible favoritism. See Fadeley, 802 P.2d at 40.

Wersal makes a secondary argument that when Canon 5(B)(2) deprives him of the opportunity to solicit funds from large groups or by mail it prevents him from running an effective campaign. The Supreme Court has said that restrictions on campaign financing must leave candidates with the ability to accumulate sufficient resources for effective advocacy. Shrink Mo., 120 S. Ct. at 908-09; Buckley, 424 U.S. at 21. Citing the impracticability of his being accompanied by a campaign committee member who could "utter the magic words" to solicit funds, Wersal argues his statewide campaign efforts were frustrated. However, no provision in the Code

specifies that members of a campaign committee must request contributions in person. Canon 5(B)(2) expressly permits committees to conduct campaigns through mailings, brochures, and advertisements. Wersal has not alleged that these alternatives are ineffective fundraising mechanisms. Accordingly, he has not demonstrated that Canon 5's restrictions stifled his campaign efforts. See also Shrink Mo., 120 S. Ct. at 909 ("a showing of one affected individual does not point up a system of suppressed political advocacy that would be unconstitutional under Buckley").

In a separate argument, the Party asserts that Canon 5(B)(2) is not narrowly tailored as applied to third parties. Much of this argument is based on a misreading of a Code section we have already clarified. Canon 5(A)(3)(c), which states that candidates "shall not authorize or knowingly permit any other person to do for the candidate what the candidate is prohibited from doing," is violated only when persons act as agents of the candidate. As a result, no ethical violations occur if third parties solicit or expend funds independently of Wersal and his campaign committee.

The district court did not err in determining that this restriction is narrowly tailored to further compelling state interests.

## VII.

The judgment of the district court is affirmed.

BEAM, Circuit Judge, dissenting.

At the outset, I admit that, insofar as I have been able to discern, Minnesota has a judicial system peopled with individuals of intellect, integrity and character, fully capable of making difficult decisions, consistent with the interests of the people of the

-56-

state.  However, such a condition is beside the point because many other states have achieved the same essential goals without trenching upon clearly established constitutional rights.  The court today holds that laws prohibiting candidates for public office from voicing their views as to issues pertinent to their conduct in office, or their opponent's conduct in office, or from appearing or speaking to like-minded citizens, are not only permissible but are apparently necessary to a well-ordered democracy.  Because in my view such a result flatly contradicts the edicts of the First Amendment, I respectfully dissent.

The court and I part ways in three critical respects.  First, the court misconstrues Minnesota law, reading it with such latitude as to contradict one-hundred fifty years of development in Minnesota's judicial selection processes.  Second, the court supplants constitutionally guaranteed rights with its own notions of preferred judicial policy.  Finally, the court countenances restrictions on fundamental, protected activity that are neither necessary nor narrowly tailored.  In the final analysis, the court sustains a set of restrictions which probably have no practical effects other than to quash election-related speech and association, and thus undermine a democratic process–precisely the fear that prompted the drafting of the First Amendment.

## I.

Prior to even contemplating the suppression of otherwise protected First Amendment activity, a state must assert a compelling interest. Presumably, that interest must reflect a state's actual and lawfully adopted policy.  The court accepts as "undeniably compelling" appellees assertion that in effecting Canon 5, the Minnesota Supreme Court furthered Minnesota's interest in maintaining the "independence" of its judiciary.  <u>Ante</u> at 19.  Certainly, all states share such an interest generally–such is the

preferred state of the American judiciary.[26]  But different sovereigns give different meanings to the term "independence."  I believe the court has misconstrued Minnesota precedent, and in doing so has used it to justify a policy prescription that lacks support in Minnesota's constitutionally established public regimen.

The court, without further analysis, simply accepts appellees' claim that Minnesota has "historically pursued the ideal of an independent judiciary."  Ante at 21.  It relies heavily on the Minnesota Supreme Court's observation in Peterson v. Stafford, 490 N.W.2d 418 (Minn. 1992), that while the federal and its own system differ, they both "create and maintain an independent judiciary as free from political, economic and social pressure as possible."  Id. at 420.  In this, the court finds license to sustain as consistent with Minnesota public policy anything which it considers to enhance judicial

---

[26]The court distorts my views on judicial independence, implying, ante at 20, that I would sacrifice such independence, and, presumably, its alleged by-product, "justice under law," on an altar of "democratic self-government."  (I assume the court is referring to my concern for the democratic election process.)  The court's statements are seriously at variance with my views and my arguments in dissent.  This case *is not* about rules under which a neutral judiciary dispenses justice under canons of ethics designed to support judicial independence, *once the selection process is over.*  I wholly agree that such a system should exist and be designed to enhance, through reasonable state regulation, the ideals of judicial independence.  This case *is* about the point at which free speech and association collide directly with an attempt by the Minnesota Supreme Court to manage (and I believe over manage) the election process in the name of judicial independence of some definition.

My dissent simply and appropriately recognizes and discusses these competing interests and reaches a result in line with the Constitution and Supreme Court precedent.  It is the court that insists that "one of the principles should give way completely to the other," that is, judicial independence, whatever that proves to be under the court's analysis, should trump the First Amendment when the election of a *judge* is at stake.  There is absolutely no support in federal law for the court's position.

independence. But this latter term is subject to broad and varied interpretations, and merely begs the question "independent from what?" While appointed judges are "independent" from the electorate, elected judges, once elected, are hardly "dependent" on the electors, and are "independent" from other elected officials. However, we are not called upon to sustain our own notions of "independence," but Minnesota's. We must therefore read the Minnesota Supreme Court's statement in Peterson in light of that state's public policy as prescribed by its citizens. As it turns out, Minnesotans have consistently rejected all attempts to narrow or curtail their elective franchise when it comes to selecting judges. Rather, they have repeatedly strengthened popular control over their judiciary.

The debate whether to appoint, retain or directly elect judges predates Minnesota's founding. The federal drafters debated it in Philadelphia. See The Anti-Federalist Papers & the Constitutional Convention Debates 120-27 (Ralph Ketcham ed., Mentor 1986). Alexander Hamilton defended their subsequent choice in print, arguing that elected judges would suffer "too great a disposition to consult popularity to justify a reliance that nothing would be consulted but the Constitution and the laws." The Federalist No. 78, at 471 (Clinton Rossiter ed. 1961). Anti-Federalists hotly contested that position. Brutus counseled trepidation at the advent of a judiciary "altogether unprecedented in a free country" which was to be "rendered totally independent, both of the people and the legislature." Brutus XI, Letter of January 31, 1788, in Ketcham, ante, at 293. See also, George Mason, Speech in Opposition to the Constitution, and Patrick Henry, Speech to the Virginia Ratifying Convention, both in Ketcham, ante, at 174, 212 (arguing that the federal judiciary made the courts too far removed from the citizenry).

The federal founders ultimately decided upon lifetime appointments, subject to good behavior, placing us (ostensibly) beyond the cavil of partisan activity and populist

suasion. U.S. Const. art. III. As federal judges, we understandably have a bias for this method. Yet, we should not confuse the rationale behind our federal system with some universal judicial *raison d'etre*, for different sovereigns value different policies. Some elect only a few officers and rely largely on appointments, while others insist on electing virtually every office-holder. Since Hamilton and Brutus debated, the arguments on each side have been well known, and were so at Minnesota's founding.

Minnesota's first judiciary arrived under the auspices of the United States with the Northwest Ordinance of 1787, which provided the Northwest Territories with congressionally-appointed judges and governor-appointed local magistrates. Northwest Ordinance §§ 4, 7 (1787); see generally, Hiram F. Stevens, History of the Bench & Bar of Minn. (1904). In 1849, Congress created the Territory of Minnesota and provided a similarly appointed judiciary. Act of Congress, March 3, 1849 §§ 2, 9, 11, 9 Stat. 403. Minnesotans did not warm to these arrangements. As one state founder noted, "it has been the complaint of the Territory . . . that we have to submit to have our Judges sent to us and have no voice in the selection . . . and [the people] have looked forward with hope to the time when they could elect their own men." The Debates & Proceedings of the Minn. Constitutional Convention 495 (1857) ("Democratic Debates & Proceedings"). That chance came in 1857 when Congress authorized Minnesotans to draw up a constitution. Act of Congress, Feb. 26, 1857, 11 Stat. 166.

Minnesota chose an interesting time to seek statehood. With the Civil War three years off, and the Supreme Court's decision in Dred Scott v. Sandford, 60 U.S. 393 (1856), one year past, any prospective new state necessarily stood in the eye of a hurricane.[27] Against this backdrop, on June 1, 1857, Minnesotans elected delegates to

---

[27]Abolitionist sentiment ran high in Minnesota and, while not reaching the levels in other states, did result in some violence. Interestingly, among the slaves brought to Minnesota during the pre-civil war period was Dred Scott, who from 1835-40 lived

a constitutional convention. One historian gave the following description. "The feeling between and within political parties was bitter. Republicans were not just Republicans but 'Black Republicans' and 'Nigger Lovers.' The Democrats were divided into 'Regular' and 'Moccasin' Democrats, but were united for convention purposes." Julius E. Haycraft, Territorial Existence & Constitutional Statehood of Minnesota (1946), republished in 1 Minn. Stat. Ann. 145, 151; see generally, William Anderson, A History of the Constitution of Minnesota (1921). Moreover, "[s]o intense was the feeling that the Republicans and Democrats would not meet in the same convention. The result was two conventions; delegates of each party held separate sessions in different rooms in the old capitol." Haycraft, ante, at 151. The two bodies met separately, largely without consultation. Even after a conference committee produced a compromise document, each convention refused to sign a document soiled by the other's signatures, so each separately signed largely identical documents. Id. at 151-52.

The records of these proceedings demonstrate that Minnesota's founders grappled with precisely the same contours as their federal forebears. The Republicans steadfastly insisted on an elected judiciary, but did debate the form of those elections. Debates & Proceedings of the Constitutional Convention for the Territory of Minn. 334-35, 402 (1858) ("Republican Debates & Proceedings"). The question of politics arose when a Mr. Galbraith proposed an amendment requiring that judicial elections never be held on the same day as an election for any other office. He reasoned that "the excitements of mere political and party issues should be kept as far as possible from the election of the judges–that the people should elect the Judges, upon their merits as judges–that they should be elected with the view of making them as independent of political parties as possible." Id. at 406. In opposition, a Mr. Lowe argued, "I do not believe it will be possible to separate the election of judges from

_____

with his "owner," Surgeon J. Emerson, at Fort Snelling. Stevens, ante, at 30-36.

political considerations." Id. The convention rejected Galbraith's amendment, and opted for concurrent judicial elections.

The Democratic convention proved far more contentious. After a committee failed to agree on a judicial selection method, the issue came to the convention floor. Democratic Debates & Proceedings, ante, at 493-509. Those favoring the Hamiltonian appointment model did so for two reasons, fear of populism and fear of political entanglement.

First, they feared the populism that might result from an elected judiciary. One vigorous opponent, a Mr. Setzer, argued:

> The great object of an appointed Judiciary, is to secure stability upon the part of the government, by having a power within the State conservative enough to restrain the waves of popular excitement, when they sweep over us as they have done in different States for years past. . . . Judges represent no constituency and are elected by no constituency. They represent nothing except the abstract ideas of equity and justice.

Id. at 495-96. The "abstract ideas of equity and justice" heralded were those set out in Dred Scott–the culmination of the grand experiment that seventy years earlier Brutus had observed was "altogether unprecedented in a free country." And the "waves of popular excitement" that so rankled delegates were the popular sentiments of radical abolitionist fervor. He continued, "[w]e see it in Wisconsin, in Iowa, and in all those States where popular excitement in reference to negro-worship and disunion has had its effect upon an elective Judiciary." Id.

Minnesota's founding debate did not turn entirely on slavery. Those opposed to an elected judiciary also raised precisely the same, eminently sensible concerns troubling the court today. Another delegate, a Mr. Meeker, argued:

> I contend that the Judges who are elected, are elected by parties, and are the mere fuglemen of caucuses. The best trickster or the best manager of caucuses is just as likely to be the nominee of a party as the most learned man in the nation. . . . [T]he greatest curse that could befal [sic] any people would be the establishment of a political court . . . . [A]nd our Judges . . . if they are to be elected, must necessarily be essentially political Judges; they cannot be anything else.

Id. at 500. They feared the instability such a system would create. "Whichever party is in the ascendancy will change the system of jurisprudence to its own standard, and there will be no security, no stability in anything." Id. at 501. Accordingly, a Mr. Sherburne recommended adopting the venerable appointment mechanisms common along the east coast. Id. at 497.

The prevailing delegates, those favoring judicial elections, met these arguments head-on. Said a Mr. Emmett:

> We hear a great deal of talk about an independent Judiciary. The phrase is in everybody's mouth. What does it mean? Independent of whom? Independent of what? Independent of the people . . . ? I say then that in order to correct the errors of Judges–and it may be important to correct them,–the office should be made elective.

Id. at 503. And as regards the fear that politics would infect an elected system, he continued, "if the people are incapable of selecting their Judges, they are also incapable of selecting the man who is to appoint the Judges . . . . The governor always selects men belonging to his own political party, while the people often select them regardless

of parties." Id. A Mr. Curtis responded to Mr. Sherburne: "[I]s a sufficient argument in favor of an appointed Judiciary, that it is old? Is it all that can be said in its favor, that it has grown hoary by age and usurpation–because it is all covered over from one end to the other by corruption and fraud?" Id. at 498.

As these exchanges demonstrate, the arguments surrounding election and appointment were well known and well met. Despite the concerns raised then and marshaled again by the court today, Minnesotans of both parties opted for an elected judiciary. Ultimately, they more feared the potential politics of an appointed bench and saw popular election as the proper remedy. Given the political climate, they desired more control over their judiciary. *That was the policy adopted by the people of Minnesota.*

Minnesota's electorate has never since intimated a change in this policy. Indeed, it has frequently reaffirmed judicial accountability to the electorate.[28] In 1912, for instance, the legislature required judicial candidates to run on a non-partisan ballot. Peterson, 490 N.W.2d at 420. That statute in no way restricted a candidate's political activities or ability to educate the voters as to his merits, opinions or values. Moon v. Halverson, 288 N.W. 579, 580-81 (Minn. 1939). The reform's objective was to ensure that candidates were elected on their own merits. Id. at 580. A merit-based election necessitates the flow of information regarding candidates to the electorate.

---

[28]Minnesota courts have consistently struck down rules depriving judicial offices of their elective nature. See State ex rel La Jesse v. Meisinger, 103 N.W.2d 864, 866 (Minn. 1960); State ex rel Smallwood v. Windom, 155 N.W. 629, 633 (Minn. 1915); State ex rel Rosckes v. Dreger, 106 N.W. 904, 906 (Minn. 1906); State ex rel Jordan v. Bailey, 33 N.W. 778, 779 (Minn. 1887) .

Minnesota has four times rejected the so-called Missouri Plan, whereby the governor could fill vacancies by non-partisan appointment, and such appointees would later be subject only to a retention vote. Maynard E. Pirsig, The Proposed Amendment of the Judiciary Article of the Minn. Constitution, 40 Minn. L. Rev. 815, 815-19 (1955-56); Peterson, 490 N.W.2d at 421 n.14. Again, voters retained their system of direct electoral control.

In 1948, a commission recommended that candidates run against a specific incumbent rather than against the field. Peterson, 490 N.W.2d at 421 n.14. It argued, "[w]here several incumbents are running for re-election, each should stand or fall on the basis of his own record. The present system does not permit this since opposing candidates run against the field." Report of the Constitutional Comm'n of Minn. 43-44 (Oct. 1, 1948). Minnesota law was amended accordingly. See 14A Minn. Stat. Ann. § 204B.06; Gustafson v. Holm, 44 N.W.2d 443 (Minn. 1950) (sustaining requirement that judicial candidates declare which specific seat is sought). Such seat-specific elections increase the electorate's focus on a specific judge's conduct.

Thus, since first permitted to select its own judiciary, Minnesota has consistently favored electorally-responsive judges. Its citizens have considered and rejected the court's policy concerns,[29] and have rejected appointment and retention systems that

_____

[29]Indeed, the Minnesota Supreme Court specifically refused to resurrect the policy debates undergone at the constitutional convention.

> There are many arguments, on grounds of both principle and expediency, against the election of judges, either in special cases or generally. Such arguments do not enter into our consideration. The fundamental law of this state is, and always has been, that the selection of judges must be submitted to the electors.

would have curtailed or eliminated popular control. Minnesota has repeatedly affirmed its citizens' right to elect their judges, and has bolstered that franchise with laws enhancing merit-based elections and furthering the flow of information regarding the candidates to the electorate.[30]  Canon 5 subverts this policy.  The suppression of election-related speech and association does not enhance the franchise.  In fact, it militates against the public's ability to elect judges based on their merits by denying citizens a reasonable vehicle for self-information.  The court assures that candidates may still discuss their "character, fitness, integrity, background (with the exception of their political affiliation), education, legal experience, work habits and abilities." Ante at 51.  However, these are simply not all of the qualities that piqued the interest of Minnesota's founders, nor those which fully inform voters who are charged with the selection of Minnesota's judiciary.

---

La Jesse, 103 N.W.2d at 866.

[30]The court attempts to divorce my review of Minnesota judiciary history from that undertaken by the Minnesota Supreme Court in Peterson, and paints the latter as justifying its conclusion today. Ante at 23 n.13. But the review undertaken in Peterson supported a regulation wholly different from that before us today.  In Peterson, the Minnesota Supreme Court reconciled Minnesota history with a measure requiring the judicial election ballot to designate incumbent jurists as such. 490 N.W.2d at 424.  The Minnesota Court found that initiative consistent with Minnesota history and sustained it because it *enhanced* the flow of information to Minnesota voters, which stands in stark contrast to the measure before us today which *suppresses* that same flow of information.  Rather than address what the Minnesota Supreme Court meant by "independent" in the proper context, the court simply transports the Minnesota court's purposely cabined conclusions into today's opinion.  But as my review, and that undertaken in Peterson indicate, in the context of Minnesota public policy, an "independent judiciary" means judges elected by well-informed, independent voters. In undermining that process by stifling the free flow of information, the court merely exacerbates the partial transfer of the Minnesota judicial selection machinery into the hands of other narrow political influences as noted elsewhere in this dissent.

The question here is whether Minnesota has expressed a sufficiently fundamental policy interest in "independent" judicial elections to even warrant our proceeding to the next stage of our constitutional inquiry. Certainly, in Peterson, the Minnesota Supreme Court instructed us that Minnesota has an interest in making its judiciary as independent "as possible." 490 N.W.2d at 420. But as the Minnesota Supreme Court cannot trump its citizens' prescribed policy, "as possible" cannot be read to include restrictions which curtail the elective franchise. Because Canon 5 does precisely that, I believe the court has clearly misapplied Minnesota law.

II.

The preceding discussion may prove largely academic, because the restrictions at issue in this case were not enacted by the Minnesota legislature but rather were created by the Minnesota Supreme Court itself. While that court has not yet ruled that its own regulations comport with fundamental state policy, it could just as easily do so. And as a federal court, we defer to state courts on questions of state law. Indeed, we wade into such questions only in the most dire of circumstances, for instance where state law is being intentionally tortured to discriminate against a protected minority, see, e.g., Bouie v. City of Columbia, 378 U.S. 347 (1964), or where an error of state law works a singular national impact, see, e.g., Bush v. Gore, 121 S. Ct. 525 (2000). But while we ought not inject ourselves into the state law question, we are charged with enforcing federal law. Federal law, and in particular the Constitution, operate to protect the rights of citizens against encroachment by both federal and state governments. In my view, even accepting arguendo that the people of Minnesota did actually intend to immunize their judicial candidates from some of the rigors of an election campaign, Canon 5 still flatly contradicts controlling precedent and violates the Constitution.

The court repeatedly emphasizes the importance of judicial independence, a proposition with which I heartily agree. Judicial independence is of the utmost importance to a fair and well-functioning judicial system. Moreover, I agree that a state has an interest not only in warding off an actual breakdown of that independence, but also the appearance of such. Every court to address this or a similar question has recognized the importance of this principle. Moreover, all have recognized, again rightly so, that by virtue of their function, judges fundamentally differ from other elected officials. The court cites extensively to these authorities. Yet the court omits noting that almost all of these courts have then further recognized that such policy notions cannot trump constitutionally-enshrined rights.[31] The Constitution makes strict demands. Often times, important and justifiable public policy goals must bow before its restraints. As judges, we must put aside our inclinations as jurists, lawyers, residents, citizens, and parents, and enforce the Constitution's restraints. The Constitution protects the most basic elements of our democratic processes, in particular the rights of candidates and citizens to express and receive views pertinent to public office, and to associate in the election context with others of their own choosing.

---

[31]See e.g., Suster v. Marshall, 149 F.3d 523 (6th Cir. 1998) (striking down restrictions on judicial campaign spending); Buckley v. Illinois Judicial Inquiry Bd., 997 F.2d 224 (7th Cir. 1993) (striking down "announce" clause); Stretton v. Disciplinary Bd. of the Supreme Court of Pa., 944 F.2d 137 (3d Cir. 1991) (narrowing construction of "announce clause"); Weaver v. Bonner, 114 F. Supp. 2d 1337 (N.D. Ga. 2000) (striking down canon restricting advertising and election speech); Butler v. Alabama Judicial Inquiry Comm'n, 111 F. Supp. 2d 1224 (M.D. Ala. 2000) (restraining enforcement of campaign advertisement and conduct restrictions); ACLU of Florida v. The Florida Bar, 744 F. Supp. 1094 (N.D. Fla 1990) (enjoining "announce" canon); In re Chmura, 608 N.W.2d 31 (Mich.) (narrowing canon to prohibit only knowingly false statements), cert. denied, 121 S. Ct. 77 (2000); J.C.J.D. v. R.J.C.R., 803 S.W.2d 953 (Ky. 1991) (striking down "announce" and other campaign restrictions).

Because Canon 5 sharply curtails, if not outright bans these activities, regardless of how laudable its purpose, it must be struck down.

Because election speech and association lie at the heart of the First Amendment, any restriction thereof must survive strict scrutiny. Eu v. San Francisco County Democratic Cent. Comm., 489 U.S. 214, 223 (1989). A restriction on otherwise protected activity must be necessary and narrowly tailored to serve a compelling state interest. Id. at 222. "[I]t is the rare case in which . . . a law survives strict scrutiny," Burson v. Freeman, 504 U.S. 191, 211 (1992), yet the court today, with little reservation, affirms a set of restrictions more sweeping in scope and effect than ever adopted elsewhere. I discuss in turn, the First Amendment rights implicated by the court's decision, the court's purported interests and the need for and tailoring of the challenged restrictions.

## A.

The Supreme Court has consistently afforded election speech and association the highest protection. "The free exchange of ideas provides special vitality to the process traditionally at the heart of American constitutional democracy–the political campaign." Brown v. Hartlage, 456 U.S. 45, 53 (1982). Few, if any, state interests prove sufficiently compelling to trump these activities. While "a state has a legitimate interest in upholding the integrity of their electoral process . . . , when a State seeks to uphold that interest by restricting speech, the limitations on state authority imposed by the First Amendment are manifestly implicated." Id. at 52. Canon 5 runs roughshod over the clearly established speech and associational rights of candidates, political parties and the voting public. That alone should foreclose any thought of Canon 5's constitutionality.

Candidates for public office enjoy both speech and associational rights.

> The candidate, no less than any other person, has a First Amendment right to engage in the discussion of public issues and vigorously and tirelessly to advocate his own election and the election of other candidates. *Indeed, it is of particular importance that candidates have the unfettered opportunity to make their views known* so that the electorate may intelligently evaluate the candidates' personal qualities and their positions on vital public issues before choosing among them on election day.

Buckley v. Valeo, 424 U.S. 1, 52-53 (1976) (emphasis added). To that end, the First Amendment protects the right to campaign and restricts states to preventing only actual fraud and corruption.[32] Brown, 456 U.S. at 55.

Candidates similarly enjoy protected association rights. These interpose themselves "at the crucial juncture at which the appeal to common principles may be translated into concerted action, and hence to political power in the community." Tashjian v. Republican Party of Conn., 479 U.S. 208, 216 (1986). A candidate's association with a political party, organization or another candidate provides a basic means of election communication. Associational rights work hand in hand with a candidate's speech rights, for without the former, the latter may prove meaningless. "'The right to associate with the political party of one's choice is an integral part of this

---

[32]The court cites Burson where the Supreme Court sustained the prohibition of "the solicitation of votes and the display or distribution of campaign materials within 100 feet of the entrance to a polling place." 504 U.S. at 193. While not a traditional "time, place, and manner" restriction in that it was content-specific, the rule curtailed speech only within that 100-foot bubble. Id. at 197. Against a vast history of election fraud and intimidation at polling places, the Court permitted only an extremely narrow, location-specific restriction on campaign speech. Burson hardly supports the absolute bans imposed by Canon 5.

basic constitutional freedom.'" Id. at 214 (quoting Kusper v. Pontikes, 414 U.S. 51, 57 (1973)).

The First Amendment protects not only speakers' rights, but also those of listeners. Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748 (1976). A campaign implicates not only the candidate's right to self-expression, but also voters' rights to receive the candidate's message. A state may not "hamstring[] voters seeking to inform themselves about the candidates and the campaign issues." Eu, 489 U.S. at 223. Nor may a state limit public debate as "[i]t is simply not the function of government to 'select which issues are worth discussing or debating.'" Brown, 456 U.S. at 60 (quoting Police Dep't of Chicago v. Mosley, 408 U.S. 92, 96 (1972)); accord United States v. Playboy Entm't Group, Inc., 120 S. Ct. 1878 (2000). In short, "[a] state's claim that it is enhancing the ability of its citizenry to make wise decisions by restricting the flow of information to them must be viewed with some skepticism." Eu, 489 U.S. at 228 (quotation omitted).

Voters' associational rights parallel their right to receive information. "To the extent that party labels provide a shorthand designation of the views of party candidates on matters of public concern, the identification of candidates with particular parties plays a role in the process by which voters inform themselves for the exercise of the franchise." Tashjian, 479 U.S. at 220.

A party's speech and association also receive protection, particularly in the election context. Eu, 489 U.S. at 224; First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765 (1978). In endorsing or inviting a candidate to speak, a party "reflects its members' views about the philosophical and governmental matters that bind them together [and] seeks to convince others to join those members in a practical democratic task," an election. Colorado Republican Fed. Campaign Comm. v. FEC, 518 U.S. 604, 615

(1996) (plurality opinion of Justice Breyer). Limitations on a party's ability to endorse a candidate "hamper[] the ability of a party to spread its message." <u>Eu</u>, 489 U.S. at 223. "[A] political party has a right to . . . select a standard bearer who best represents the party's ideologies and preferences." <u>Id.</u> at 224 (citations and quotations omitted). The suppression of a party's right to associate with candidates of its choice, renders it powerless.[33] "The Party's attempt to broaden the base of public participation in and support for its activities is conduct undeniably central to the exercise of the right of association." <u>Tashjian</u>, 479 U.S. at 214.

Canon 5 trenches upon these rights in a variety of ways. The "announce" clause, for instance, effectively bans campaigning itself. The court disagrees, saying "[t]he judicial candidate simply does not have a First Amendment right to promise to abuse his office." <u>Ante</u> at 16. But the court proves too much. The Supreme Court established in <u>Brown</u> that no candidate for any office possesses such a right. "[T]he state may ban such illegal agreements without trenching on any right . . . protected by the First Amendment." 456 U.S. at 55. Beyond prohibiting fraud and corruption, and the appearance of the same, a state may prevent judicial candidates from prejudging or pledging outcomes in specific cases or even in particular types of cases. But beyond such, a state cannot further unreasonably curtail election-related speech.

---

[33]The court relies in part on <u>Timmons v. Twin Cities Area New Party</u>, 520 U.S. 351 (1997), in which the Court sustained a ban on fusion candidates–those appearing on the ballot as representing more than one party. That law governed form of the ballot but did not restrict parties from endorsing the candidate of their choice. This prevented small parties from bootstrapping their way into public election funds by endorsing a major party candidate, and then claiming the resulting votes. As it did not affect candidate or party speech and associational rights, the Court sustained the rule. That case does not support the banning of all election-related discussion and association.

The announce clause, however, bars discussion of *all* disputed legal and political issues. The court's narrowing construction to "issues likely to come before the candidate," ante at 49, is meaningless. See Buckley v. Illinois Judicial Inquiry Bd., 997 F.2d 224, 229 (7th Cir. 1993) (recognizing the true scope of such a "limitation").[34] Even could such a category be properly cabined, it would still roam far beyond the narrow category of speech left unprotected by the Court in Brown. The court assures us, for instance, that a candidate may discuss his "judicial philosophy." Ante at 51. I cannot fathom "disputed legal issues" more likely to come before a court than the proper role of stare decisis, narrow or strict construction, original intent and substantive due process. Yet are these not captured by the term "judicial philosophy?" The term is as sweeping as the court's allegedly narrow construction.[35]

---

[34]Construing similar language, similarly curtailed, Judge Posner noted:

> There is almost no legal or political issue that is unlikely to come before a judge of an American court, state or federal, of general jurisdiction. The civil war in Yugoslavia? But we have cases in which Yugoslavs resist deportation to that nation on the ground that they face persecution . . . ; and some years ago the Illinois courts were embroiled in a custody fight involving a child who didn't want to return to the then Soviet Union with his Soviet parents.

Buckley, 997 F.2d at 229.

[35]To truly grasp the impact of today's opinion, one must consider the plight of the judicial candidate who in 2002 must decipher Minnesota ethical obligations. Between them, Canon 5, the district court's opinion and the court's opinion today supply three different versions of acceptable speech. Moreover, all three remain contingent on the Minnesota Supreme Court's agreeing with the court's construction, for if it does not, the judicial candidate may still face sanctions. The threat of chilled speech is too great to countenance.

Along with the announce clause, the restrictions on attending and speaking at party gatherings, and the bans on seeking or using endorsements, and on self-identifying as a party member similarly tread upon protected First Amendment rights. Obviously, by banning such activities, Canon 5 directly impacts the rights of judicial candidates. The court insists that this impact goes no further, that Canon 5 affects only the rights of candidates, and not those of any third parties. Ante at 36-38. But this cannot be, as laws that affect candidates necessarily affect voters. Bullock v. Carter, 405 U.S. 134, 143 (1972). The court strives mightily to justify the impact wrought on candidates' rights, arguing for instance that judicial candidates have less interest in certain types of policy debate than do other types of candidates. Ante at 16. Such arguments do little to justify collateral effects on the rights of others.[36]

Canon 5 affects third parties in a variety of ways. For instance, the announce clause curtails voters' rights to hear a candidate's views on those issues most pertinent to future conduct in office. By preventing candidates from seeking endorsements, Canon 5 potentially prevents voters and parties from gauging a candidate's attitude towards a party, something central to many voters' decision-making processes. Despite the court's protestations, it also de facto curtails a party's ability to endorse the candidate of its choosing. Parties are unlikely to endorse their preferred candidate so long as they fear handing an opponent a potential election issue–specifically, the specter of an ethics violation–even if none exists. This in turn curtails voters' rights to hear parties' views as to candidates. Additionally, by preventing candidates from attending or speaking at party gatherings, Canon 5 trenches upon parties' rights to

---

[36]Of course, the court belies its own contention with the argument, addressed infra, that political parties work a unique effect upon the electoral scheme. Ante at 33-34, 40-41. How the court reconciles its concern with party involvement with its assurances that the rights of candidates alone are affected escapes me.

express themselves in the manner of their own choosing, specifically by presenting the candidate of their choice.

Our First Amendment rulings usually parse the hypothetical. We worry about "potential" chilled speech, and the supposed ill effects that might flow from quashed association. Presented only with the text of Canon 5, one might well hypothesize that restricting candidates' abilities to express their views and to associate with political parties would lead to two results: higher rates of incumbent retention; and disproportionate campaign fund-raising. This hypothesis follows from a rudimentary understanding of public campaigns and the judiciary.

Campaigns for public office, judicial, legislative or executive, necessarily favor incumbents. Incumbents have better name recognition, better resources, are usually better staffed, and barring some recent disaster, are afforded the presumptions of experience and competence. Of the three branches of government, the judiciary seems to least capture the public's attention. Judicial incumbents, therefore, may enjoy these benefits to an even greater extent.

Unlike most of our First Amendment cases, however, this case need not stick to the hypothetical. Canon 5 has been in effect in Minnesota for some time, in varying forms. We therefore can look to recent elections to see whether these supposed harms have come to pass. Minnesota is no exception to the rule that the public pays the least attention to the judiciary. Indeed, one Minnesota Supreme Court Justice has observed of judicial elections that "it's pretty darn hard to get people to care." Amendment of Canon 5 of the Code of Judicial Conduct: Hearing Before the Minn. Supreme Court 44 (1997). Election statistics bear this out. In 1996 one-half million voters cast a ballot in the Presidential race yet did not vote in the Supreme Court race. League of Women Voters of Minnesota, Choosing Minnesota's Judges: An Examination of the Present

System and Alternative Proposals 6 (1998).  Moreover, 86% of responding voters said they needed more information about judicial elections and 77% observed they got less information about judicial than other elections.  Id.

Fund-raising and other election data demonstrate disturbing distortions in a supposedly democratic process.[37]  During the 2000 election cycle, of those judges up for election, only five of sixty-seven trial court benches were contested and only one of four appeals court judges faced a challenger.  In 1998, only ten of eighty-nine trial court benches were contested.[38]  Judicial fund-raising reflects the same bias.  In the 2000 election, the four incumbent Supreme Court justices seeking re-election raised a combined $505,070.63.  Of their opponents, only two raised sufficient funds to warrant disclosure.  These two together raised only $23,582.67.  Candidate Filings, Minnesota Campaign Finance and Public Disclosure Board (2000).  A stable judiciary is, on balance, a laudable pursuit and perhaps Minnesotans have no cause to find fault with any of their judges.  But it is just as likely that, at least in part, these imbalances flow

---

[37]Prior to every Supreme Court election, the Minnesota State Bar Association holds a plebiscite between the candidates among its members.  The results display in dramatic fashion the extent to which an incumbent may count on support from groups most vested in the judiciary.  Since 1974, incumbents have out-polled their challengers by the following margins: 1974: 91% to 9% and 85% to 15%; 1978: 77% to 23% and 95% to 5%; 1982: 95% to 5%; 1992: 61% to 39% and 85% to 15%; 1996: 75% to 25% and 90% to 10%.  Minnesota State Bar Ass'n, Judicial Elections Task Force Report & Recommendations 32 Appendix D (1997).  While this case has been pending, the 2000 election cycle has come and gone.  I occasionally use the most recent data, which post-dates the record on appeal.

[38]These numbers reflect a consistent trend.  Since 1980, the number of contested trial benches of those facing election were as follows: 2 of 25; 0 of 25; 5 of 56; 9 of 54; 2 of 67; 4 of 93; 5 of 82; 6 of 42; 14 of 111.  Minnesota State Bar Ass'n, Judicial Elections Task Force Report & Recommendations 7 (1997).

from a lack of information resulting from the suppression of election-related speech and association and from other impediments inherent in Canon 5.

Not surprisingly then, in recent history prior to the 1998 election which spawned this suit, only two incumbent judges had lost elections. See Mary Ellen Egan, Judging for Himself, City Pages 4-5 (June 17, 1998). The record details appellant Wersal's campaign difficulties, hamstrung by both fund-raising and speech limitations. Indeed, an ethics complaint forced him out of the 1996 campaign for fear of losing his law license and being unable to support his family. Another Supreme Court candidate, Michael Demoss, faced a similar problem after making comments about his views on abortion. With challengers unable to create traction by discussing actual issues, or to raise funds, the results in judicial elections are hardly surprising.

Minnesota's judicial elections thus reveal the precise results one might suspect Canon 5 would produce. Moreover, its chilling effects on electoral activity are precisely those which spurred the First Amendment. It might be naive to argue that incumbents must never be permitted to use their offices to bolster their own positions–such conduct seems inimical to politics generally. But American tradition has long recognized that the best defense against such conduct is the right of a people to freely associate, assemble and speak. It may be, as a matter of policy, that an appointed judiciary best protects our liberties. I certainly think so, and the court obviously agrees. But Minnesota has made a different choice, and having chosen an elective selection method it cannot then turn around and quash candidates' constitutionally guaranteed rights. The upshot is this: when a state opts to hold an election, it must commit itself to a complete election, replete with free speech and association. Certainly, a state may regulate corruption as in Brown, the integrity of the voting process as in Burson and the form of its ballot as in Timmons v. Twin Cities Area New Party, 520 U.S. 351 (1997). But the state may not unduly curtail speech and

association, for they are too central to First Amendment interests in the election process.

## B.

The court does not discuss the foregoing authorities. Rather, it tries to sidestep this entire doctrinal inconvenience with a simple argument–that judges are different. It surmises that given the nature of their office, judges, even when elected, warrant different treatment under the First Amendment.[39] The court identifies three interests, all under the rubric of enhancing judicial independence, which it deems sufficiently compelling to warrant the suppression of fundamental rights: safeguarding a judge's ability to apply the law neutrally; maintaining the public confidence in judicial impartiality; and insulating judges from political pressure. Ante at 19, 24. Many courts have noted, and I agree, that judges differ from other officials. As a matter of constitutional law, however, the judiciary has no more or less right than any other coordinate branch to insulate itself from the rigors of public debate, particularly in the election context. The court embarks on a path long since foreclosed, as the Supreme Court has directly and pointedly refused to permit such specialized treatment, even given the court's stated concerns.

---

[39]The court dallies briefly with an analogy between judges and civil servants, drawing heavily on United States Civil Service Commission v. National Association of Letter Carriers, 413 U.S. 548 (1973). There, the Court found compelling the interests of forging a civil service capable of enforcing laws without regard to party allegiances, and in avoiding the appearance of bias among federal employees in order to maintain the public confidence. Id. at 565. The analogy fails. Offices are made elective rather than appointive in order to introduce a degree of public control. Given the discretion that judges wield, that voters would desire such control is hardly surprising. The state's interests in these two areas are quite divergent.

The judiciary may not rely on the "maintenance of confidence in the judicial system," essentially the interest advanced by the court today, as a justification for the suppression of protected expression.  Landmark Communications, Inc. v. Virginia, 435 U.S. 829, 833 (1978).  In Landmark Communications, Virginia attempted to rely on this interest to justify a statute making it a misdemeanor to report on confidential judicial disciplinary proceedings.[40]  Id.  Recognizing that "the law gives judges as persons, or courts as institutions . . . no greater immunity from criticism than other persons or institutions," the Court ruled "neither the Commonwealth's interest in protecting the reputation of its judges, *nor its interest in maintaining the institutional integrity of its courts* is sufficient to justify the subsequent punishment of speech at issue here."  Id. at 839, 841 (quotation omitted, emphasis supplied).  "[I]njury to official reputation is an insufficient reason for repressing speech that would otherwise be free [and] *the institutional reputation of the courts, is entitled to no greater weight in the constitutional scales*."  Id. at 841-42 (quotation omitted, emphasis supplied).

Landmark Communications extended a well-established body of precedent forbidding judicial efforts at self-isolation from public debate.  Potential "disrespect for the judiciary" and worries of the "disorderly and unfair administration of justice" cannot compel the suppression of protected expression.  Bridges v. California, 314 U.S. 252,

---

[40]The court may seek to cabin Landmark Communications as merely preventing the criminalization of speech whereas this case regards an administrative or professional sanction.  The statute in Landmark Communications made the challenged conduct a misdemeanor and subjected the paper to a $500 fine.  While criminal in form, the actual harm in that case was much less severe than the threat judicial candidates face in Minnesota.  Failure to abide by ethical canons can subject a lawyer or a judge to sanction, removal or disbarment.  In terms of gravity, the restrictions at issue here pose much the greater danger.  See In Re Primus, 436 U.S. 412 (1978) (holding that a state's interest in effective judicial administration must bend before an attorney's First Amendment rights).

270 (1941). In <u>Bridges</u>, the Court prevented a trial court from silencing newspaper editorial criticism of its conduct during ongoing legal proceedings, because:

> The assumption that respect for the judiciary can be won by shielding judges from published criticism wrongly appraises the character of American public opinion . . . . [A]n enforced silence, however limited, solely in the name of preserving the dignity of the bench, would probably engender resentment, suspicion, and contempt, much more than it would enhance respect.

<u>Id.</u> at 270-71.

This argument grows all the stronger in the election context. In <u>Wood v. Georgia</u>, 370 U.S. 375, 379-80 (1962), the Court reversed a contempt order issued against a sheriff who told a grand jury that he opposed its having been empaneled. The state argued such conduct constituted a "clear and present danger" to the administration of justice. <u>Id.</u> at 387. However, both the sheriff and the judges involved were elected officials charged with public responsibilities. <u>Id.</u> at 390, 395. The sheriff, therefore, "had the right to enter the field of political controversy, particularly where his political life was at stake. The role that elected officials play in our society makes it all the more imperative that they be allowed freely to express themselves on matters of current public importance." <u>Id.</u> at 394-95 (citation omitted); <u>see also</u>, <u>Craig v. Harney</u>, 331 U.S. 367, 370, 376-77 (1947) ("Judges are supposed to be men of fortitude, able to thrive in a hardy climate. . . . Judges who stand for reelection run on their records. That may be a rugged environment. Criticism is expected."); <u>Pennekamp v. Florida</u>, 328 U.S. 331, 336-40 (1946) (rejecting a "threat to the impartial and orderly administration of justice" as justification for a contempt order stemming from a political cartoon); <u>accord</u> <u>Richmond Newspapers, Inc. v. Virginia</u>, 448 U.S. 555 (1980) (holding

that without good cause, criminal trials must be open to the public); <u>Nebraska Press Ass'n v. Stuart</u>, 427 U.S. 539 (1976) (affirming principle of judicial transparency).

The First Amendment therefore forecloses the use of criminal or contempt sanctions to suppress criticism of the judiciary. The use of punishing civil and professional sanctions to accomplish the same end is equally offensive. I see little difference between truthful criticisms leveled at a judge by a newspaper editor or elected official on one hand, and a judicial candidate on the other.[41] I similarly see little difference between the use of the contempt power, and the use of a Supreme Court's ability to regulate bench and bar, to silence judicial criticism. Judges, elected or otherwise, are thought to be citizens of honor, integrity and fortitude. By holding office they subject themselves to public criticism.[42] <u>Monitor Patriot Co. v. Roy</u>, 401 U.S. 265, 274 (1971). And as elected officers, this holds doubly so for Minnesota's judiciary. A judicial candidate has a right to criticize the opinions, philosophies, rulings and public statements of the incumbent, who has a concomitant right to respond in kind. In sustaining Canon 5, the court permits precisely what these precedents say may not

---

[41]The court argues that Minnesota "seeks not to shield judges from published criticism, but to prevent them from deserving such criticism." <u>Ante</u> at 25 n.14 (citations and quotations omitted). But the court's cure kills the patient. The worry, presumably, is that candidates will do or say things that pledge or seem to pledge them to certain outcomes in return for support, thus threatening judicial impartiality. The cure is to ensure that candidates can do nothing at all, thus destroying the election Canon 5 set out to save. Whether the court likes it or not, facing public criticism, whatever the source, comes with being a public official. Moreover, it is most certainly part of being a public candidate. This regulation flies in the face of both.

[42]Couching these prohibitions as necessary professional regulations falls similarly short, for the Supreme Court has repeatedly favored First Amendment expression over professional ethical regulations. <u>See</u> <u>Ohralik v. Ohio State Bar Ass'n</u>, 436 U.S. 447 (1978); <u>In re Primus</u>, 436 U.S. 412 (1978).

be done, except that rather than only protecting judges from the speech of others, they are apparently designed, according to the court, to protect incumbent judges and judicial candidates from the effects of their own speech. Such paternalistic notions have long been suspect, and are patently unconstitutional. Even granting the court's contention that Canon 5 will prevent some undesirable conduct, the vast majority of the speech and association suppressed will be legitimate, wholesome, democratic activity. Contrary to the court's assumption, judges, in this context, are not different. In the eyes of the First Amendment, they are the same.[43]

## C.

I turn finally to the more mundane application of the Supreme Court's strict scrutiny jurisprudence. Even accepting that a restriction may serve a compelling state interest, in order to warrant the suppression of otherwise protected speech and association, it must be necessary to achieve its purpose. Burson, 504 U.S. at 198. Despite the court's best efforts, Canon 5 fails this test.

Because a regulation that does not achieve its stated end cannot be necessary, the touchstone of necessity is effectiveness. Eu, 489 U.S. at 228-29; Tashjian, 479 U.S. 214. For instance, in Eu, the state argued that its ban on political party endorsements of primary candidates served the compelling interest of protecting

_____

[43]To bolster its "judges are different" argument, the court relies in part on Cox v. Louisiana, 379 U.S. 559 (1965), where the Court reviewed a statute prohibiting the picketing of a courthouse with the intent to influence a judge, juror or court officer in the course of his duties. Id. at 560. The Court reversed the conviction on the grounds that an official had misrepresented to the defendant that his protesting was legal. Id. at 569-70. Despite this holding, the court engaged in a lengthy dictum discussing the statute itself. The statute, the Court observed, regulated only conduct, and did not infringe upon speech or assembly at all. Id. at 563.

primary voters from confusion and undue influence. Eu, 489 U.S. at 228. The Court doubted whether the restriction could achieve its stated rationale because of all the organizations with an interest in primary elections, the ban silenced only political parties. Id. at 228 n.18. Many other equally or more vocal groups remained free to endorse whomsoever they wished. Moreover, "the growing number of endorsements by political organizations using the labels 'Democratic' or 'Republican' has likely misled voters into believing that the official governing bodies were supporting the candidates." Id. As the restriction did not effect its goal, it was not necessary.[44]

Canon 5 suffers from precisely this same flaw. It bars judicial candidates from attending or speaking at "political organization gatherings" or from seeking, accepting or using endorsements from a "political organization," and defines a "political organization" as a "political party organization." Canon 5 purports to safeguard a judge's ability to apply the law neutrally, to maintain the public confidence in judicial impartiality and to insulate judges from public pressure. Given its restricted application, however, Canon 5 simply cannot achieve these goals.

The court worries that by appearing at, speaking to or being endorsed by a political party, a candidate will appear "in hoc" thereto. As a general proposition, this

---

[44]Ordinarily lawmakers may address problems piecemeal rather than having to propose all-encompassing solutions. Indeed, permitting "over-inclusiveness" and "under-inclusiveness" underpins basic rationality review. See Williamson v. Lee Optical of Okla., Inc., 348 U.S. 483 (1955). Such is not the case regarding fundamental rights, however, where we enforce a much higher standard. Playboy, 120 S. Ct. at 1888. Here, failure to solve the entire asserted problem is fatal. See, e.g., 44 Liquormart, 517 U.S. 484 (Opinion of Stevens, J.); Discovery Network, 507 U.S. at 418. Strict scrutiny imposes a much heavier burden on Canon 5 than on the "time, place and manner" restrictions reviewed in Cornerstone Bible Church v. City of Hastings, 948 F.2d 464, 470-71 (8th Cir. 1991).

is simply wrong. The Supreme Court recognized in Eu that one cannot conclude from such conduct that a candidate will necessarily tow a party line. 489 U.S. at 225 n.15. But even accepting the court's premise, Canon 5 falls far short of its goals because it fails to include candidate appearances before, speeches to, or endorsements by other politically active organizations. Candidates remain free to consort with organizations such as the National Organization of Women, the NAACP, the Christian Coalition, the National Association of Manufacturers, the AFL-CIO or the NRA. Many of these organizations are implicitly, and some explicitly, aligned with one or another of the major parties.[45] Candidates remain free to seek and use the endorsements of the insurance lobby, the Minnesota Trial Lawyers Association, or any other political or quasi-political organization not organized as a "political party." If the court's "appearance" concerns are valid, this ought to cause it grave anxiety.

The court argues that political parties are more likely to command a candidate's acquiescence to party positions on the bench. Ante at 33-34, 40. Were this true, the court's argument would still fail because one does not satisfy the necessity requirement merely by solving for the greatest influence, but rather by addressing all significant influences. The court's assertion, however, is untrue. Of all the politically-oriented organizations around, the two major parties are both "big-tent" organizations–ideologically consistent only in their aggregate distinctions one from another. Within each party a variety of opinions on most issues may be found. A candidate's appearance at a party function hardly indicates endorsement of its views. (I am certain that Republicans everywhere will be either delighted or dismayed to know that Ralph Nader's appearance at their national convention last fall signified his support for their platform. See Eun-Kyung Kim, Nader Addresses Youth Convention, AP

---

[45]Indeed, statistics from the 2000 election indicate that NAACP members voted for democratic candidates at a *higher* rate than did members of the democratic party.

<u>Online</u>, WL 24553132 (August 2, 2000).)  A speech at a party function supports nothing beyond the candidate's own words, and an endorsement suggests only that the endorser finds a candidate more palatable than any other presently available.

On the other hand, quasi-political organizations, particularly those that focus on a single or only a few issues, are much more likely to demand and command a candidate's attention and support.  The Federalist Society, for instance, is an organization dedicated to strict construction.  Were it to endorse a candidate, it stands to reason that the candidate would be seen as a "strict constructionist."  Abortion issue groups are among those most likely to endorse only candidates who will be thought to adhere strictly to the relevant "party line."  Given their focus and intensity, such groups are much more capable than political parties of bringing their members' wrath to bear on elected officials including judges who stray from their point of view.

The record reflects the increasing role in and influence over judicial election politics exerted by these groups.  Among those groups active in recent Minnesota judicial elections were state and local bar associations, the League of Women Voters, an organization called "People for Responsible Government," Minnesota Women Lawyers, Lavender Magazine and the Minnesota Family Council.  Such groups can easily bring pressure to bear in judicial elections.[46]  Two 1996 examples from judicial elections in other states bear this out.  In Nebraska, Supreme Court Judge David Lanphier was defeated in a retention vote after authoring an opinion striking down

---

[46]During the 2000 campaign, two Supreme Court justices received between eight and fifteen percent of their total contributions from one plaintiff's law firm, which had previously been accused of attempting to buy elections with tobacco settlement money. Candidate Filings, Minnesota Board of Campaign Finance & Public Disclosure (2000). Canon 5 does not solve electoral problems, but merely selectively sweeps them under the rug.

Nebraska's term limits law. His defeat, largely over the opinion, appears to have been engineered by a single-issue organization named "Citizens for Responsible Government." Similarly, Justice Penny White of the Tennessee Supreme Court was hounded out of office after voting with the majority to remand a death penalty case. The influence of such groups featured prominently in the testimony when the Minnesota Supreme Court held a hearing on whether to expand Canon 5 to exclude all such groups, rather than just political parties.

The court leaves single-issue political parties such as the Twin-Cities Area New Party, which brought the suit in Timmons, entirely out in the cold. Many smaller parties including the Right to Life Party, the Natural Law Party, and until this recent election cycle, the Green Party, tend to focus on only a few key issues. These groups are distinguished from advocacy groups only by having exercised their right to organize as a political party. Under the court's opinion, having done so will cost them their rights to engage in election-related speech and association.

If the Minnesota Supreme Court is truly worried about the appearance of or actual judicial bias, it ought to be concerned with more than political parties. By ignoring other political groups, Canon 5 leaves unregulated sources of funding, endorsements and pressures, which, if the court's concerns about judicial partiality are justified, do much more to undermine public perception than political parties. In fact, barring political party involvement will most likely make the system less tenable. By removing the only organizations that endorse candidates across a spectrum of issues, voters are left with only the shrill voice of narrow advocacy coming from special interest groups. Because the canons do not achieve their stated goals, they cannot be considered necessary, and therefore cannot pass strict scrutiny.

## D.

Not only must a restriction on speech be necessary, it must also be narrowly tailored to use the least restrictive means in achieving its stated goal. <u>Burson</u>, 504 U.S. at 198. In doing so, a restriction must suppress as little protected activity as possible. "If a less restrictive alternative would serve the Government's purpose, the [state] must use that alternative." <u>Playboy</u>, 120 S. Ct. at 1886. Canon 5 runs rampant through acres of protected speech, and in doing so eschews many less restrictive options.

If the court's goals do accurately reflect the actual interests of the people of Minnesota, they could be most efficiently and effectively achieved by amending the Minnesota Constitution to allow for the appointment, rather than the election of judges. This would achieve the court's interests in one stroke, without requiring the suppression of a single protected word. In undertaking its "narrowly tailored" analysis, the court does not discuss this option. Of course, doing so would reopen for the court the sticky problem of Minnesota's having repeatedly expressed a preference for elected judges.

Compliance with the First Amendment does not require so radical a change, for other states have successfully adopted a variety of mechanisms to insulate their judges from the pressures of elected office without impermissibly trenching on protected constitutional rights. Various states, including Nebraska and Tennessee, have adopted the Missouri Plan, discussed in Section I, whereby initially-appointed judges stand in periodic retention elections. Other states have used a more piecemeal approach, remedying specific problems. Some, for instance, alleviate the financial pressures faced by judges for whom the bench provides a livelihood by lengthening terms of office or by providing generous pensions in order to ease the transition back to private practice. Of course, Minnesota's failure to adopt any such scheme does not license the

Minnesota Supreme Court to impose on judges and their putative supporters ethical canons abusive to their First Amendment rights.

## III.

In sum, the court starts with a series of premises, many of which I accept. The Supreme Court of Minnesota has every right to regulate the state's bench and bar. It may protect its judiciary against both actual and the appearance of partiality. It may adopt measures tempered to do so in the ordinary course of its judiciary's conduct. However, that principle of judicial independence, as has been recognized by almost every court to take up the question, must give way before rights which, unlike the court's policy, have been constitutionally secured. Judges, whatever their differences from other officials, have no more right than others to avoid the rigors of public debate and public elections. No matter what the wisdom of placing the judiciary beyond the rigors of such activities, and no matter what selection method we as federal judges may prefer, the people of Minnesota have adopted an elective judiciary–a system which under our Constitution, must come replete with speech and associational rights.

Because the court finds compelling an interest that is not shared by the people of Minnesota, trumps well established speech and associational rights with values not adopted by the citizens of the state, permits the erection of an unconstitutional self-insulating barrier between the judiciary and the public, and permits regulations that are neither necessary nor narrowly tailored, I must respectfully dissent.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.